**Mary Roseann SAAL, Plaintiff,**

**v.**

**J. William MIDDENDORF, Secretary of the United States Navy, in his official capacity, Defendant.**

**No. C–73–1299 WWS.**

United States District Court,
N. D. California,
Civil Division.

Feb. 8, 1977.

Mary C. Dunlap, Nancy L. Davis, Jo Ann Chandler, Joan Messing Graff, Equal Rights Advocates, Inc., San Francisco, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., Richard F. Locke, Asst. U. S. Atty., Civ. Div., San Francisco, Cal., for defendant.

OPINION AND ORDER GRANTING
PARTIAL SUMMARY JUDGMENT

SCHWARZER, District Judge.

In this action plaintiff challenges on due process grounds the validity of Instruction

1900.9A issued by the Secretary of the Navy and entitled "Policy for the Separation of Members of the Naval Service by Reason of Homosexuality." Paragraph 4.a states the policy to be as follows:

"Members involved in homosexuality are military liabilities who cannot be tolerated in a military organization. In developing and documenting cases involving homosexual conduct, commanding officers should be keenly aware that members involved in homosexual acts are security and reliability risks who discredit themselves and the Naval service by their homosexual conduct. Their prompt separation is essential. At the same time, every safeguard must be taken to insure against unjust action that will stigmatize an innocent person."

Plaintiff enlisted in the United States Navy on December 17, 1971. Following training she was assigned as an air traffic controller at Alameda Naval Air Station. In January 1972 she entered on a three-year enlistment contract. In March 1973, after an investigation by the Navy into plaintiff's activities, she signed a statement admitting homosexual relations with another Navy enlisted woman. Thereafter, administrative proceedings to separate plaintiff were instituted pursuant to Navy regulations. An administrative discharge board was convened on July 6, 1973, and, after hearing, recommended on the basis of plaintiff's admitted homosexual activity that she should be separated from the service with a general discharge.

This action was filed on June 27, 1973, seeking injunctive relief to prevent the Navy from discharging plaintiff for her homosexual activity as well as damages. In August 1973, Judge Oliver J. Carter granted preliminary injunctive relief staying the discharge pending a decision on the merits. In November 1973, the Chief of Naval Personnel notified plaintiff that he had directed her separation with a general discharge. In January 1974, defendant moved for summary judgment contending (1) that plaintiff had failed to exhaust her administrative remedies, (2) that the administrative

hearing accorded plaintiff satisfied due process, and (3) that the discharge was lawful. On July 10, 1974, Judge Carter denied the motion, rejecting the first contention and holding that the other two contentions were not ripe for disposition by summary judgment.

With the term of her enlistment contract nearing its end, plaintiff in September 1974 submitted a written request for extension to her commanding officer in accordance with Navy regulations. The commanding officer, aware of the pending litigation and not wanting to take action which might affect it, forwarded the request without recommendation to the Chief of Naval Personnel, the final authority in such matters, and asked for advice. On December 12, 1974, the Chief of Naval Personnel replied by denying plaintiff's request for extension and ordering her separation upon expiration of her enlistment with an honorable discharge. The prior directive ordering her discharge by reason of unfitness was cancelled and her discharge was "characterized as warranted by the average performance evaluation marks which have been earned during her period of service." At the same time, plaintiff was assigned reenlistment code RE–4 which designates persons ineligible for reenlistment.

Plaintiff's enlistment expired on January 6, 1975. Defendant immediately moved to dismiss this action as moot. By order dated August 19, 1975, Judge Carter granted the motion, lifted the prior stay order thereby permitting issuance of an honorable discharge to plaintiff, but gave plaintiff leave to file an amended complaint. On August 22, 1975, plaintiff was discharged from the Navy. On September 15, 1975, she filed her first amended complaint in which she contends that she was deprived of due process by reason of having been rendered ineligible for reenlistment under Instruction 1900.9A.

On May 5, 1976, plaintiff moved for summary judgment on two grounds:

(1) That Instruction 1900.9A is unconstitutional on its face in that it presumes the unfitness of every person involved in homo-

sexual conduct, in violation of the due process clause of the Fifth Amendment;

(2) That Instruction 1900.9A is unconstitutional as applied to plaintiff by disqualifying her from reenlistment despite her demonstrated fitness for military service, in violation of the Fifth Amendment.

On June 24, 1976, defendant filed a cross-motion for summary judgment, contending in substance:

(1) That the action is moot;

(2) That the court lacks jurisdiction of the subject matter;

(3) That plaintiff has failed to exhaust her administrative remedies;

(4) That plaintiff has no constitutional right to continued employment; and

(5) That the discharge of homosexuals as military liabilities is rational.

In August 1976, this case was assigned to the undersigned. Extensive argument was heard on the motions and supplementary memoranda and affidavits have been submitted by the parties.

The Court has concluded that plaintiff is entitled to partial summary judgment on the issue of the constitutional validity of Instruction 1900.9A and the related regulations as applied to her. The present record does not permit disposition of her claim for damages and other relief. In the following sections of this opinion, the Court will consider the issues in the order presented by defendant's motion for summary judgment.

## I. The Action is Not Moot

Defendant argues that the action became moot when plaintiff was granted an honorable discharge upon the expiration of her enlistment contract. While it is true that the jurisdiction of federal courts is constitutionally restricted to "cases" or "controversies", those words, as the Supreme Court has said,

". . . have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968).

There can be no question that plaintiff presents a question in an adversary context and in a form capable of and proper for resolution through the judicial process. As will be discussed in detail below, as a result of the application of the challenged Instruction 1900.9A, plaintiff was barred first from having her enlistment extended and thereafter from reenlistment.

If the application of that Instruction to plaintiff violated due process, she may have a claim for damages and other relief regardless of the fact that she was honorably (though involuntarily) discharged. See, *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 755–756, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 140–141, 157–173, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Accordingly, the action cannot be dismissed as moot.[1]

1. If defendant's position with respect to mootness were to be accepted, it would effectively preclude for all time any constitutional challenge of Instruction 1900.9A for all defendant would have to do to save the Instruction is to issue an honorable discharge whenever an aggrieved person files suit. The problem therefore is one "capable of repetition, yet evading review" and as such warrants the Court's retention of jurisdiction. See, *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); compare, *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

## II. *This Court has Subject Matter Jurisdiction*

■ Plaintiff asserts jurisdiction under 28 U.S.C. §§ 1331 and 1343(4). The latter section does not apply because the action is not brought "under any Act of Congress providing for the protection of civil rights, including the right to vote."

■ Under Section 1331, this Court has jurisdiction "of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 . . . and arises under the Constitution . . . of the United States." It is not disputed that plaintiff's claim arises under the Fifth Amendment of the Constitution. Defendant argues, however, that the amount of pay and allowances plaintiff would have received had she remained on active duty is speculative because it is not known whether her request for extension of her enlistment would otherwise have been granted.

■ The degree of certainty required to meet the jurisdictional test is considerably less than defendant would have the Court believe. It is sufficient if plaintiff's monetary claim is made in good faith. As the Supreme Court stated only recently in *Mt. Healthy City Board of Ed. v. Doyle*, —— U.S. ——, 97 S.Ct. 568, 570, 50 L.Ed.2d 471 (1977), quoting from *St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1938):

> " ' . . . The sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the Court jurisdiction does not show his bad faith or oust the jurisdiction.' Id., at 288–289 [58 S.Ct., at 590]."

In the light of the record discussed below, plaintiff's prospects of realizing the amount claimed are sufficient to preclude a finding that the claim is less than the jurisdictional amount "to a legal certainty." See also, *Committee for GI Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 472 (1975) (". . . the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce".) [2]

## III. *Plaintiff is not Barred By a Failure to Exhaust Administrative Remedies*

■ Defendant contends that plaintiff has failed to exhaust her administrative remedies by having failed to apply for reenlistment and, upon rejection, seeking review before the Board for Correction of Naval Records. That Board is established pursuant to 10 U.S.C. § 1552 to recommend to the Secretary of the Navy the correction of any military record where it finds "the existence of any error or an injustice." See, 32 C.F.R. §§ 723.2(a), (b), 723.6. The Secretary may take such action on the recommendation as he deems appropriate. 32 C.F.R. § 723.7.

In *Champagne v. Schlesinger*, 506 F.2d 979 (7th Cir. 1974), it was held that Navy enlisted persons who had received general discharges on the ground of unfitness under Instruction 1900.9A were not entitled to judicial relief without first exhausting their remedies before the Board. The Court based its decision in that case on the Navy's representation that its regulations do not make the discharge of homosexuals mandatory. Inasmuch as the Board could recommend that the record of discharge could be corrected to reinstate plaintiffs and the Secretary could accept that recommenda-

---

**2.** See also, *Davis v. Passman*, 544 F.2d 865 (5th Cir. 1977), holding that a private right of action for damages exists under the equal protection aspect of the Fifth Amendment Due Process Clause, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), holding that a private right of action may be implied for violation of the Fourth Amendment

by reason of an invalid search and seizure. Both cases are collateral authority for the existence of jurisdiction here.

Moreover, the subject matter of this action, notwithstanding the fact that it concerns the rules governing the military service, is plainly within the Court's jurisdiction. See, e. g., *Crawford v. Cushman*, 531 F.2d 1114, 1119–1121 (2nd Cir. 1976).

tion, the Court found resort to the federal court to be premature.

The present case is distinguishable. Although defendant has in this Court taken the position that the Instruction does not make discharge mandatory, the manner in which it had processed the matter internally reflects a contrary interpretation. Defendant has at no time during the litigation claimed, or offered evidence to show that either the administrative board which recommended plaintiff's general discharge for unfitness or the Chief of Naval Personnel which accepted the recommendation, rejected her request for extension and classified plaintiff as ineligible for reenlistment, ever considered plaintiff's case "on the merits."[3] Moreover, by subsequently issuing plaintiff an honorable discharge, defendant has effectively precluded review of its actions by the Board for Correction of Naval Records for there is no record left to correct. Even if plaintiff were to request a correction of the RE-4 rating, that correction if granted would not remove the stigma associated with her discharge, nor would it open the way to her reenlistment since the Instruction challenged in this action would on its face preclude it. Hence, here, unlike in *Champagne*, there is no "correction" which would afford relief and therefore no remedy to be exhausted.

The Court considers that in the posture of this case, the controlling authority is *Downen v. Warner*, 481 F.2d 642 (9th Cir. 1973). There plaintiff was discharged from the Marine Corps upon her marriage to a man who was the father of two children. Navy regulations provided for the discharge of a woman who is the step-parent of a child which is under 18 and in the woman's household more than 30 days a year. 32

C.F.R. § 730.61(c)(2)(iii). The district court had dismissed for failure to exhaust the remedies before the Board for Correction of Naval Records. The Court of Appeals reversed, holding:

> "The judicially-created exhaustion requirement is intended to facilitate the development of a full factual record, to encourage the exercise of administrative expertise and discretion, and to promote judicial and administrative efficiency. * * * The doctrine is not an absolute bar to judicial consideration and where justification for invoking the doctrine is absent, application is unwarranted. * * * Resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board. Mrs. Downen's complaint rests solely upon the resolution of her constitutional claim. Accordingly, Mrs. Downen was not barred from District Court through her failure to exhaust administrative remedies." (481 F.2d at 643, citations omitted.)

The reasoning of the Court of Appeals is controlling here and requires the Court to proceed to a consideration of the merits. See, also, *Committee for GI Rights v. Callaway*, 171 U.S.App.D.C. 73, 518 F.2d 466, 474 (1975).

## IV. Plaintiff Asserts an Interest Entitled to Constitutional Protection

 Defendant makes a two-pronged argument: first, that homosexual acts are not a constitutionally protected activity, and, second, that plaintiff has no constitutional right to continued employment by the Navy. Defendant's points are well taken but they do not end the inquiry whether

---

**3.** In this connection, the official summary of the hearing before the administrative board on July 6, 1973, is illuminating. It reflects the statement by the board's senior member that "he himself was familiar with [plaintiff's] work and that her work was outstanding"; the argument of the recorder (Navy counsel) "that although [plaintiff] was an outstanding worker, the main issue was whether she had engaged in homosexual acts", that under Instruction 1900.-9A the "prompt separation [of homosexuals]

was essential" and that plaintiff "was a clearcut case"; and, finally, the senior member's closing comment "that he was sympathetic toward [plaintiff] but that they had to be guided by the applicable instructions." Defendant does not contend nor could it be found that this hearing amounted to a full and fair evaluation of plaintiff's fitness based on the record of her performance. Compare, *Matlovich v. Secretary of the Air Force*, No. 75–1750 (U.S.D.C. D.C. July 16, 1976) (Unreported decision, Tr. 7).

plaintiff is able to assert an interest to which the Constitution affords protection.[4]

In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court, while rejecting a constitutional claim based on a failure to rehire an untenured teacher, acknowledged that "interests in liberty [under the due process clause] would be implicated" if the state, in declining to rehire a person, made a charge "that might seriously damage his standing and associations in his community" or "imposed . . . a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.*, 408 U.S. at 573, 92 S.Ct. at 2707. The principles underlying *Roth* were only recently reviewed and confirmed in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, *reh. denied*, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), where the court said that "*Roth* recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation . . . ." *Id.*, 424 U.S. at 709, 96 S.Ct. at 1164.[5]

The *Roth* decision was applied to a case involving federal employment in *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976). Plaintiff, a physician, had been dismissed during the term of his residency for unsatisfactory performance and "other considerations" and charged, among other things, violation of his Fifth Amendment rights. Although the court in that case found no protectible liberty interest, its analysis to determine whether plaintiff had established such an interest is relevant here. The court stated that the line between protectible interests and other interests "should be drawn on the basis of the nature of the charge used as a grounds for termination and not the actual consequences of the charge." Judge Sneed, speaking for the court, went on to say:

"The 'liberty interest' is the interest an individual has in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy." (537 F.2d p. 366.)

In an earlier decision, *Stewart v. Pearce*, 484 F.2d 1031 (9th Cir. 1973), the court held that a teacher's demotion to library work, coupled with an order to submit to a psychiatric examination, sufficiently stigmatized him to invoke due process rights.

The stigmatizing effects of defendant's actions are indisputable. The initial determination to discharge plaintiff as unfit on the ground of homosexual conduct, the subsequent refusal to extend her term of enlistment and the assignment to her of the RE–4 classification, all of which is necessarily reflected in her service record, coupled with the compelled disclosure of her otherwise private sexual activity, plainly fall within the concept of stigma under *Roth* and the "label of infamy" under *Stretten*. The Navy's own position as reflected in its instructions and regulations and its actions in this case, and the continuing existence of criminal statutes proscribing certain homosexual activities, compel the conclusion that, rightly or wrongly, a disclosure of homosexual activity will tend to stigmatize a person, particularly when coupled with an involuntary separation from military service. Accordingly, the Court concludes that

4. See, *Doe v. Commonwealth*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751, rehearing denied, 425 U.S. 985, 96 S.Ct. 2192, 48 L.Ed.2d 810 (1976), summarily affirming a three-judge court decision rejecting a constitutional attack on a Virginia statute making sodomy a crime, reported at 403 F.Supp. 1199 (E.D.Va.1975); and *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896–897, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (in the absence of legislation, government employment may be terminated summarily). And, unlike *Crawford v. Cushman*, 531 F.2d 1114, 1124–1125 (2nd Cir. 1976) (holding invalid the Marine Corps' mandatory discharge rule for pregnant women), this case does not involve activities constitutionally protected against the burden of irrebuttable presumptions.

5. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), on which defendant relies, is distinguishable in that the circumstances of petitioner's discharge from the police force were not such as to raise an issue concerning a possible resulting stigma.

plaintiff has established a protectible liberty interest under the Fifth Amendment.[6]

### V. The Defendant's Regulations and Procedures Applicable to Persons Who Have Engaged in Homosexual Activity Violate Due Process

We come now to the merits of plaintiff's claim. At the outset, it must be understood that this case does not call into question the Navy's freedom to exercise its discretion with respect to enlistment, reenlistment, extension of enlistment or discharge of personnel. Nor does it undertake to establish substantive standards for the composition or management of the military service. The courts have "long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974). "[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). "To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress." *Schlesinger v. Councilman*, 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975).

■ Yet, "one's constitutional rights are not surrendered upon entering the Armed Services. But the rights are applied . . . in light of the 'unique military exigencies' that necessarily govern many aspects of military service." *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 1294–1295, 47 L.Ed.2d 556 (1976) (Powell, J., concurring). It is only if plaintiff "can demonstrate that there is no rational connection" between defendant's regulations governing its treatment of persons who have engaged in homosexual activity and the "unique military exigencies" that the court may subject those regulations to due process scrutiny. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976); see also, *Quinn v. Muscare*, 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165, *reh. denied*, 426 U.S. 954, 96 S.Ct. 3183, 49 L.Ed.2d 1194 (1976).[7]

---

**6.** In view of the Court's conclusion, it is not necessary to decide whether plaintiff may also have a protectible property interest. Clearly a simple failure or refusal to reemploy or reenlist a person discharged from military service upon expiration of his term of enlistment provides no foundation for a due process claim, *Tennessee v. Dunlap*, 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976), nor does a "mere subjective 'expectancy' " of continued employment. *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Here, however, it is arguable that there existed "a legitimate claim of entitlement" to extension of the enlistment term or reenlistment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In this case, unlike *Roth*, Navy regulations specifically provided that "[e]xcept as otherwise provided herein, members who are serving under an enlistment contract may extend or re-extend their enlistments by their voluntary agreement, subject to approval by their commanding officer . . . ." Bureau of Naval Personnel Manual, Sec. 1050150–2.a. When plaintiff submitted her request for extension shortly before expiration of her enlistment, her commanding officer forwarded it to the Chief of Naval Personnel with the request for advice, making no recommendation "not wanting to take any action which might affect the course of the litigation." Affidavit of E. E. Golden, Commander U.S. Navy, dated July 11, 1975, p. 2. That the approval would have been given had it not been for the pendency of the litigation is implicit from plaintiff's periodic Performance Evaluations pursuant to Bureau of Naval Personnel Manual Sec. 3410150 in which she uniformly received the highest ratings and recommendations for reenlistment. See Appendix A to this opinion. In all other respects, except her homosexual activity, plaintiff's qualification for extension or reenlistment appears beyond question. See, Bureau of Naval Personnel Manual, Secs. 1050150–2.c.; 1040300–3. See also, *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 366 (9th Cir. 1976).

**7.** In *Kelley*, the Court found that the "overall need for discipline, esprit de corps, and uniformity" were sufficient to preclude a due process attack on regulations governing the length of policemen's hair. The Court left open the question whether the degree of judicial deference accorded local police regulations is the

■ The provisions of the Navy regulations under which plaintiff was processed after disclosure of her homosexual activities state in relevant part:

"1. Members may be separated by reason of misconduct with an undesirable discharge, unless the particular circumstances in a given case warrant a General or an Honorable discharge. A discharge by reason of misconduct may be executed only when directed or authorized by the Chief of Naval Personnel. Members may be recommended for discharge by reason of misconduct for:

\* \* \* \* \* \*

"b. Homosexual acts while a member of the naval service, sexual perversion, including but not limited to lewd and lascivious acts; sodomy; indecent exposure, indecent acts with or indecent assault upon a child; or other indecent acts or offenses. *Processing for discharge is mandatory.*" (Bureau of Naval Personnel Manual, Sec. 3420185–1.-b) (emphasis added).

Aside from homosexual acts, only sale or trafficking in drugs or fraudulent concealment of pre-service homosexuality or drug trafficking are subject to mandatory processing for discharge. (Sec. 3420185–1.c., e.) In the case of every other class of misconduct warranting an undesirable discharge, the regulation in some form or oth-

er specifically directs that the decision to discharge shall be based on the merits of the case. Thus, in case of "frequent involvement of a dishonorable nature with civil and/or military authorities" the person shall be notified of his deficiencies and counseled; "[i]f no improvement is forthcoming within a reasonable time, the member *may* be processed [for discharge]." (Sec. 3420185–1.a; emphasis added.) In case of drug abuse, "[c]onsideration for either discharge or retention will be predicated upon an evaluation of the member in the context of the whole man concept . ." except in case of sale or trafficking in drugs. (Sec. 3420185–1.d.) In case of conviction by civil authorities, provision is made for a report and recommendation for retention in the service. (Sec. 3420185–1.e.) Finally, a person *may* be recommended for discharge on grounds of unauthorized continuous absence of one year or more. (Sec. 3420185–1.f.)

It is true that Sec. 3420185 standing alone makes mandatory only processing for an undesirable discharge, not discharge itself. This means that a person charged with homosexual activity must appear before an administrative discharge board which makes a recommendation to the Chief of Naval Personnel where final authority rests. (Sec. 3420185.)[8] But these provisions must be read in light of the control-

same as that to be accorded regulations of the military services. *Id.* 96 S.Ct. at 1445. Defendant contends, and this Court assumes for purposes of this decision, that the strict test of *Kelley* controls here, namely that plaintiff must demonstrate that the regulation and policy are so irrational as to be arbitrary. *Id.* 96 S.Ct. at 1446. It may well be, however, that where enforcement of the particular regulation and policy has the effect of stigmatizing a person, which was not true in *Kelley*, the appropriate test is less severe, as it is, for example, in cases of civilian employment and in cases of military personnel engaging in constitutionally protected activities. See, *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 897–898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969); *Singer v. United States Civil Service Commission*, 530 F.2d 247 (9th Cir. 1976), *vac. on other grounds*, —— U.S. ——, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977) (rational connection re-

quired between conduct complained of and grounds for discharge of civilian employee); *Carlson v. Schlesinger*, 167 U.S.App.D.C. 325, 511 F.2d 1327, 1331 (1975) (military conditions must be shown to "dictate" different treatment to warrant First Amendment rights restrictions).

8. Defendant's regulations also provide an alternative procedure for discharge by reason of unsuitability with an honorable or general discharge. Sec. 3420184. Among the grounds specified are "Homosexual or other aberrant sexual tendencies *(no acts involved)* . . ." (Sec. 3420184–1.d., emphasis added.) But again homosexuality is singled out among the specified grounds in that the regulation does not afford such persons counseling and the "opportunity to overcome his/her deficiencies." (Sec. 3420184–3.)

ling policy set forth in Instruction 1900.9A which states in part:

> "4. a. . . . Members involved in homosexuality are military liabilities *who cannot be tolerated in a military organization . . . Their prompt separation is essential.*" (Emphasis added.)

In the light of these provisions, the Court is unable to conclude that defendant has provided that the fitness for service of persons who have engaged in homosexual acts is to be determined on each individual's merits.[9]

In response to the Court's request for a statement setting forth the reasons for these policies and regulations respecting homosexual activity, defendant submitted an affidavit by the Assistant Chief of Naval Personnel for Performance and Security which is set forth in the margin.[10] In the affidavit the Navy takes the position that "administrative processing is mandatory . . . because it is perceived that homosexuality adversely impacts on the effective and efficient performance of the mission of the United States Navy in several particu-

lars." But the particulars specified could in each case be grounds for excluding other persons as well. Thus, "tensions and hostilities" could justify exclusion of members of minorities or other persons who also may be "despised" by some; disruptive emotional relationships could exist between male and female Navy personnel justifying exclusion of women; parents may become concerned over their children associating with Navy personnel who may gamble, use alcohol or drugs or engage in illicit heterosexual relations; persons other than homosexuals may engage in disruptive physical aggression; and fear of criminal prosecution, social stigma and divorce and the danger of undue influence is a risk created by any form of illegal or antisocial conduct, not confined to homosexuality.

In other words, the problems which the Navy enumerates to support blanket exclusion of persons who engage in homosexual acts are problems which are endemic to a heterogeneous society such as the Navy and with which it deals in the ordinary course of its operations on a case by case basis.[11]

9. It appears from the documents filed by defendant in support of its motion that the Department of Defense has issued a "fact sheet" describing its policy as "requir[ing] prompt separation of homosexuals. The homosexual person is considered unsuitable for military service and is not permitted to serve in the Armed Forces in any capacity." This statement by the Department of Defense appears to confirm the Court's conclusion.

10. "It is considered that administrative processing is mandatory. This is because it is perceived that homosexuality adversely impacts on the effective and efficient performance of the mission of the United States Navy in several particulars.

(a) Tensions and hostilities would certainly exist between known homosexuals and the great majority of naval personnel who despise/detest homosexuality, especially in the unique close living conditions aboard ships.

(b) An individual's performance of duties could be unduly influenced by emotional relationships with other homosexuals.

(c) Traditional chain of command problems could be created, i. e., a proper command relationship could be subverted by an emotional relationship; an officer or senior enlisted person who exhibits homosexual tendencies will be unable to maintain the necessary respect and trust from the great majority of naval personnel who despise/detest homosexuality, and

this would most certainly degrade the individual's ability to successfully perform his duties of supervision and command.

(d) There would be an adverse impact on recruiting should parents become concerned with their children associating with individuals who are incapable of maintaining high moral standards.

(e) A homosexual might force his desires upon others or attempt to do so. This would certainly be disruptive.

(f) Homosexuals may be less productive/effective than their heterosexual counterparts because of:

(1) Fear of criminal prosecution;

(2) Fear of social stigmatization;

(3) Fear of loss of spouse and/or family through divorce proceedings as a result of disclosure;

(4) Undue influence by a homosexual partner."

11. It is perhaps significant that the Navy did not list among the problems perceived in connection with homosexuals the traditional objection that because of their alleged susceptibility to blackmail they present potential security risks. Presumably the experience of the armed services has led to a more enlightened view of this, perhaps the most serious of the potential problems, which recognizes that susceptibility to blackmail is in the mind of the victim, whether he has accumulated gambling debts,

Defendant does not, and presumably could not, contend that blanket exclusion of persons who have engaged in homosexual acts would eliminate or substantially reduce these problems. Yet those persons alone are classified as "intolerable" and singled out for "prompt separation."

The Court accepts, for purposes of this decision, the Navy's judgment that persons who engage in homosexual acts may be a source of the listed problems. That, however, affords no basis for policies and regulations singling out such persons from among all of the possible sources of problems for mandatory exclusion, regardless of the fitness of the particular individual. The Navy makes no contention that such persons as a class are less likely to meet its standards of fitness than others, or suffer any other deficiency which makes it necessary or appropriate to treat them alone as undesirable across the board.[12] Plaintiff's showing in this case—demonstrating a

record of service judged outstanding by Navy command even during the period of the pending litigation—establishes that, at least as applied to her, the mandatory exclusion policies and regulations are irrational and capricious. See Appendix A to this opinion. Due process requires that plaintiff's application for extension of service or reenlistment receive the same consideration as that of other Navy personnel similarly situated, without reference to policies or regulations substantially mandating exclusion or processing for discharge of persons who engage in homosexual activity.[13]

In reaching this conclusion, the Court does not hold that the Navy is constitutionally required to enlist or retain persons who engage in homosexual acts. The Court considers this to be in the nature of a procedural due process case.[14] See, *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It does not hold that the Navy may not exclude plain-

has been compromised in heterosexual escapades, or engaged in other illegal or immoral activities.

**12.** In *Norton v. Macy,* 135 U.S.App.D.C. 214, 417 F.2d 1161, 1167, n. 28 (1969), the court observed:

"The most widely accepted study of American sexual practices estimates that 'at least 37 per cent' of the American male population have at least one homosexual experience during their lifetime. Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male 623 (1948). If this is so, a policy of excluding all persons who have engaged in homosexual conduct from government employ would disqualify for public service over one-third of the male population. This result would be both inherently absurd and devastating to the public service. The public service is protected from the consequences of any such policy by its inability to identify most of the offending males. But we must assume that the Government carries many such potentially embarrassing employees on its roles without noticeable impact on the efficiency of the service."

See also, National Institute of Mental Health, Final Report of the Task Force on Homosexuality (Oct. 10, 1969) p. 6.

**13.** The Navy's policies and regulations respecting homosexuals also raise serious equal protection problems under the Fifth Amendment. See, *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (". .

the Due Process Clause of the Fifth Amendment contains an equal protection component . . ."). While it is not necessary to decide that issue here, the reasoning of the court in *Crawford v. Cushman,* 531 F.2d 1114, 1121–1124 (2nd Cir. 1976), has a bearing on the evaluation of these policies and regulations. As was the case in *Crawford,* the Navy's policies and regulations are both underinclusive and overinclusive. They do not subject other categories of disruptive conduct to mandatory exclusion while at the same time compelling mandatory exclusion of every person found to have engaged in homosexual activity, regardless of whether it has any impact on the accomplishment of the Navy's mission. See also, *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (mandatory rule barring from the food stamp program any household whose members are not related to each other held irrational and therefore a denial of equal protection).

**14.** See *Arnett v. Kennedy,* 416 U.S. 134, 164–167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); and the discussion in *Tribe, Structural Due Process,* 10 Harvard Civil Rights—Civil Liberties Law Review 269, 284–289, 304–310, 314 (1975).

tiff if it determines that her homosexual activities render her unfit. It holds no more than that due process requires plaintiff's fitness to serve to be evaluated in the light of *all relevant factors* and free of any policy of mandatory exclusion.

The Navy, along with the other military services, has been in the vanguard in providing equal opportunities to segments of our society that have long suffered discrimination. Without impairment of its efficiency or effectiveness, it has abandoned the stereotypes of the past that have stigmatized women and members of minority races in favor of judging the fitness of individuals on their merits.[15] On the basis of the instant record, its failure to accord the same treatment to plaintiff simply because she has engaged in homosexual acts must be found to be irrational and capricious and thus in violation of the Fifth Amendment.

Accordingly, there being no genuine issue of material fact respecting the validity as applied to plaintiff of Instruction 1900.9A and of Section 3420185–1.b, as implemented by Instruction 1900.9A, plaintiff is entitled to partial summary judgment determining and declaring that the foregoing provisions as applied to her violate the Fifth Amendment and enjoining defendant from applying Instruction 1900.9A to any application for reenlistment by plaintiff.

Inasmuch as questions of fact remain with respect to plaintiff's claim for damages, that claim cannot be adjudicated on this motion. The Court directs, however, pursuant to Rule 54(b), Federal Rules of Civil Procedure, the entry of final judgment with respect to plaintiff's claim for declaratory and injunctive relief, there being no just reason for delay.

A status conference will be held in this action at 9:00 a. m. on February 25, 1977.

IT IS SO ORDERED.

15. "Those societies which cannot combine reverence to their symbols with freedom of revision, must ultimately decay either from an-

## APPENDIX A

*Evaluation of Performance, contained in Plaintiff's Reports of Enlisted Performance Evaluation.*

For period 1 Mar. 1972—1 Sept. 1972:

ACAN SAAL has been in the division for one month during which she has progressed exceptionally well, showing an obvious desire to learn. SAAL does require occasional supervising to help maintain her confidence. She is very neat and orderly, and liked by all.

For period 2 Sept. 1972—1 Mar. 1973:

AIRMAN SAAL demonstrates an enthusiastic desire to acquire an extensive knowledge in the air traffic control field. This enthusiasm and a mature approach to each problem indicates she should become an excellent air traffic controller. She has high esteem for her subordinates as well as superiors. She wears an attractive, tidy uniform, distinguished in all aspects. Her vivacious, warm personality makes her well-liked and regarded by others. SAAL is highly recommended for advancement to petty officer.

For period 28 Mar. 1973—1 Sept. 1973:

SAAL performs her duties in a highly satisfactory manner. She can be depended upon to carry out any assigned task given to her. She always presents a clean and neat appearance and wears her uniform with pride. She has the type of personality that enables her to get along well with others and is considered a good shipmate.

For period 1 May 1974—21 May 1974:

ACAN SAAL is a cheerful and co-operative co-worker and maintains good rapport with all those assigned in the Duty office. Not only does her attractive appearance and fine military behavior do her credit, but sets an example for those she works and lives with.

For period 1 Aug.—31 Aug. 1974:

archy, or from the slow atrophy of a life stifled by useless shadows." Alfred North Whitehead, Symbolism (1959) pp. 87–88.

ACAN SAAL always performs her assigned duties in an intelligent and professional manner. She can be depended on to use her own initiative. She responds to orders and regulations in a very mature manner. Her everyday appearance and personal hygiene are above reproach and reflect great pride in herself and the United States Navy. ACAN SAAL is an easy going, self assured person who is a pleasure to serve with and is admired by all her shipmates.

ACAN SAAL is a definite asset to the United States Navy. She is strongly motivated and is always willing to do more than her share of the workload. She has an excellent rapport with seniors and peers alike. Potentially career motivated.

For period 1 Sept. 1974—28 Feb. 1975:

ACAN SAAL is a very professionally minded individual, whose innermost thoughts concern satisfactory job accomplishment, whether military or professional. ACAN SAAL has spent a great deal of time accumulating knowledge of the AC rating and applying this knowledge in training those personnel with less experience. ACAN SAAL is completely dependable in relation to military rules and regulations. Her personal appearance traits reflect an extra effort put forth in the maintenance of uniforms and she always displays a neat well cared for appearance. AIRMAN SAAL possesses a thoroughly charming personality with perky disposition, good manners and selflessness hallmark which make her a welcome addition to the division. Her command of the English language, orally and in writing, is above average. *She is recommended for reenlistment* and for advancement.

AIRMAN SAAL is a very positively motivated individual who loves her rate. Yet when called upon to assist the Training Petty Officer, she worked tirelessly to construct a physical fitness program for the division and to perform essentially all clerical duties concerned with the training program. Her work was outstanding in every respect. (Emphasis added.)

For period 1 Mar. 1975—31 Jul. 1975:

AIRMAN SAAL is in training on the Ground Control position and progressing well. She studies very well on her own and always prepares herself thoroughly for each step in training. Under close observation AIRMAN SAAL shows good judgment and foresight on Ground Control while maintaining composure. Quite well liked, AIRMAN SAAL always enhances the positive attitude her work group strives for. AIRMAN SAAL is always smartly dressed and presents a fine example of today's enlisted woman. *Highly recommended for advancement and reenlistment.* (Emphasis added.)