Miriam benSHALOM, Petitioner,

v.

SECRETARY OF ARMY, Clifford Alexander or his successor; and Commanding Officer, United States Army, Headquarters, Third Battalion, 351st Regiment, Fourth Brigade, 84th Division (Training), Respondents.

Civ. A. No. 78–C–431.

United States District Court,
E. D. Wisconsin.

May 20, 1980.

Stephen M. Glynn, Shellow & Shellow, Milwaukee, Wis., for petitioner.

Lawrence O. Anderson, Asst. U.S. Atty., Milwaukee, Wis., for respondents.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

The petitioner, Miriam benShalom, brings this mandamus action seeking to compel the respondents to reinstate her as a member of

the United States Army Reserves. Ms. benShalom was honorably discharged from the reserves on December 1, 1976. The matter is before the court on cross-motions for summary judgment and respondents' alternative motion to dismiss.

The unique question of law presented here is whether petitioner can be discharged from the Army (even if the discharge is "honorable") simply because she is a homosexual, although there is no showing that her sexual preferences interfered with her abilities as a soldier or adversely affected other members of the Service.

Ms. benShalom, enlisted in the United States Army for a 3-year period of Reserve duty in November, 1974. She graduated from the 84th Division (Training) Drill Sergeant School at Fort Leonard Wood, Missouri, and from the Drill Sergeant Course at the Leadership Academy, 84th Division (Training), in Milwaukee, Wisconsin. Apparently Ms. benShalom was the only woman in the graduating class. After graduation, she became an instructor at the Fourth Brigade Drill Sergeant Academy. She commenced her duties December 1, 1975. At various times during her enlistment, Ms. benShalom acknowledged that she was homosexual.

On December 11, 1975, Ms. benShalom was informed, by letter from Major Jerome D. Hardt, that she was being considered for discharge from the Reserves under Chapter 6 of the Army Regulations (A.R. 135–178) dealing with homosexuality. She was originally charged with engaging in homosexual activities. She demanded a hearing before a Board of Officers.

On June 11, 1976, the Army revised the charge, deciding instead to process her discharge under Chapter 7–5b(6) of A.R. 135–178. This section allows for the discharge of any soldier who "evidences homosexual tendencies, desire, or interest, but is without overt homosexual acts". She received formal notice of the revised charge on July 12, 1976. Again, she demanded a hearing before a Board of Officers.

A hearing was held September 18, 1976. Testimony was adduced establishing that the petitioner had publicly acknowledged her homosexuality during conversations with fellow reservists, in an interview with a reporter for her division newspaper, and in class, while teaching drill sergeant candidates. There was no proof that she engaged in homosexual acts, or had done anything that could be interpreted as a homosexual advance toward female reservists. The respondents do not dispute the fact that she was a fine candidate for drill sergeant school, a capable soldier, and an excellent instructor.

The Board of Officers recommended that the petitioner be discharged from the Service as "unsuitable" because of her homosexuality. They further recommended that the discharge be "honorable".

The petitioner wrote a letter on October 22, 1976 to the Commander, Fifth Army, requesting that he reject the recommendations of the Investigating Board and retain Ms. benShalom in the reserves. On December 1, 1976, petitioner was notified by Fifth Army Headquarters that her plea was denied. She was honorably discharged from the Army effective December 1, 1976.

The respondents raise several challenges to the court's jurisdiction; none of the challenges have merit.

■  This action is brought under 28 U.S.C. Secs. 1331, 1361 and 1651. The Petition alleges violations of rights guaranteed under the First, Fifth and Ninth Amendments to the U. S. Constitution. The action, therefore, clearly "arises under the Constitution . . . of the United States" and is "brought against the United States, any agency thereof or any officer or employee thereof in his official capacity". Jurisdiction is properly alleged under Sec. 1331(a).

■  Assuming mandamus to be an appropriate remedy in this action, see *infra*, the court could properly issue a writ directed to the respondents pursuant to Secs. 1361 and 1651. Therefore, this action will not be dismissed for claimed jurisdictional deficiencies on the face of the Petition. See,

*Mindes v. Seaman,* 453 F.2d 197, 199 (5 Cir. 1971); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

■ The next procedural issue is whether sovereign immunity bars suit, absent the consent of these respondents. The Petition alleges that the respondents, as officials of the United States, acted beyond their constitutional powers. The Petition also challenges as unconstitutional the Army regulation pursuant to which the respondents acted. No money damages are sought. Under these circumstances, sovereign immunity does not bar suit against the respondents. *Carter v. Seamans,* 411 F.2d 767, 770 (5 Cir. 1969), *cert. den.* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121; *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

■ The government next questions whether mandamus is an appropriate remedy. Mandamus is an appropriate remedy if (1) the petitioner has a clear right to the relief sought, i. e. reinstatement in the Army Reserves; (2) there is a plainly defined and peremptory duty on the part of the respondents to do the act in question, i. e. reinstate the petitioner; (3) there is no other adequate remedy available. *Panko v. Rodak,* 606 F.2d 168, 169 (7 Cir. 1979); *Holmes v. United States Board of Parole,* 541 F.2d 1243, 1247 n. 5 (7 Cir. 1976); *Carter v. Seamans, supra,* at 773.

■ Mandamus is controlled by equitable principles. It is an extraordinary writ, but its issuance is largely a matter lying within the discretion of the court to which the Petition is addressed. *Kerr v. U. S. District Court,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976); *Holmes v. Board of Parole, supra; Carter v. Seamans, supra.*

■ Juxtaposing the requirements for mandamus with the undisputed facts, I find that the petitioner lacks any other adequate available remedies. I also conclude that if petitioner's discharge is determined to be unconstitutional, the duty to reinstate her is clear. I finally conclude that even if the

regulations could be read as placing some degree of discretion in the officials responsible for the decision to approve or disapprove the recommendation of the Board of Officers, the discretion may not be exercised in an unconstitutional manner. *Matlovich v. Secretary of Air Force,* 591 F.2d 852, 859 (D.C.Cir.1978); *Harmon v. Brucker,* 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); *Hodges v. Callaway,* 499 F.2d 417 (5 Cir. 1974); also see, the First Amendment discussion, *infra.* If a soldier's discharge is found to be violative of the Constitution, the implicit but clear non-discretionary duty of the respondents is to reinstate the soldier upon learning of the unconstitutional nature of the discharge. Any contrary conclusion would render the extensive procedural safeguards in the Army regulations meaningless, and would create a large loophole through which constitutional scrutiny of the discharge process would be rendered ineffective. The court finds mandamus to be an appropriate remedy available to the petitioner in this case.

Having concluded that the court has subject matter jurisdiction over the federal question alleged in the Petition, and having concluded that mandamus is an appropriate means to obtain the relief requested, the court will next consider whether this particular controversy is one that is justiciable; or one more properly reserved to the legislative and executive branches.

■ Most decisions as to the composition, training, equipping, and control of the Army are beyond judicial review. Ultimate responsibility for these decisions is vested in the legislative and executive branches. U. S. Constitution, Art. I, Sec. 8, Cl. 16; *Gilligan v. Morgan,* 413 U.S. 1, 10–11, 93 S.Ct. 2440, 2445–2446, 37 L.Ed.2d 407 (1972); *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

■ Strong policies compel the courts to give the military "the widest possible latitude" in the administration of personnel matters. *Sanders v. United States,* 594 F.2d 804, 813 (Ct.Cl.1979); *Orloff v. Willoughby, supra; Mindes v. Seaman, supra.*

■ The courts are extremely reluctant to interfere with the military's exercise of discretion over its internal affairs. This is particularly so when the military makes personnel changes, pursuant to its regulations, through its promotion or discharge processes. *Dilley v. Alexander*, 603 F.2d 914, 919–20 (D.C.Cir.1979); *Pauls v. Secretary of Air Force*, 457 F.2d 294 (1 Cir. 1972).

■ Restricted judicial review is not, however, the equivalent of no judicial review. Courts will review, without hesitation, cases in which it is alleged that the military violated the Constitution, applicable statutes, or its own regulations. *Dilley v. Alexander, supra*, at 920; *Harmon v. Brucker, supra*, 355 U.S. at 579, 78 S.Ct. at 433; *Mindes v. Seaman, supra*.

"It is established, of course, that the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations." *Matlovich v. Secretary of Air Force, supra*, at 859; *Sanders v. United States, supra*, at 814; *Hodges v. Callaway, supra*.

■ In her Petition, Ms. benShalom has alleged violations of the First, Fifth and Ninth Amendments to the Constitution. The court has examined those allegations in light of the policies favoring non-review of military matters. Review of the merits of her allegations is appropriate in this case when one considers the nature and strength of the challenges to her discharge, the potential harm she will suffer if review is refused, the overall insignificant interference with the vital duties of the military, and the insufficient showing that this is a matter involving a question of such military expertise that it ought to be left to the superior experience and knowledge of the Army. *Mindes v. Seaman, supra*, at 201–2. Therefore, the court concludes that it has jurisdiction over this action in all respects, and the merits must be considered to determine .if the court should mandate the petitioner's reinstatement in the Army.

## Procedural Due Process

On the surface, the process used to discharge the petitioner is beyond reproach. She was accorded, and she exhausted, every available administrative remedy. She was given a full hearing with the aid of skilled military and private counsel. She presented evidence and cross-examined the witnesses against her. Her due process challenge essentially appears to be that the procedures were faulty because there was no "nexus" between the allegations supporting her discharge and her actual abilities as a soldier. See, *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969). On the due process argument, the court believes that petitioner cannot establish either a constitutionally-protected "property" or "liberty" interest under the Fifth Amendment.

■ The petitioner cannot establish any "entitlement" to continued service sufficient to elevate her subjective expectancy to a status worthy of due process protection. The controlling statute, 10 U.S.C. Sec. 1162(a), provides that Army reserves may be discharged under regulations prescribed by the Secretary of the Army.

The regulations, Paragraph 7–5b(6), A.R. 135–178, permit discharge of a reservist as "unsuitable" for service if the reservist "evidences homosexual tendencies, desire, or interest, but is without overt homosexual acts". Any expectancy she might have had was further attenuated by her open admissions of homosexuality. She has failed to establish any "existing rules or understanding", or anything in the nature of an implied contract, to support her claim of entitlement to continued service. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 571–2, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972); *Sims v. Fox*, 505 F.2d 857, 861–2 (5 Cir. 1974).

■ When she enlisted, the petitioner was only "entitled" to be retained for as long as she complied with Army regulations. If she failed to comply, she was entitled to be retained until such time as

she could be discharged in full conformity with Army regulations, and only after being accorded the full protection of the procedural safeguards available. This is exactly what was accorded her here; she could expect nothing more.

■ The claimed deprivation of a due process "liberty" interest is equally without merit. Her discharge was honorable, and there was no public disclosure by the Army of the reasons for her discharge.

To support a "liberty" interest claim, the petitioner would be required to show that her discharge was based upon "an unsupported charge which could wrongfully injure (her reputation)." *Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974); *Sims v. Fox, supra*, at 864; also see, *Knehans v. Alexander*, 566 F.2d 312, 314 (D.C.Cir.1977). The lack of showing any "stigma" distinguishes this case from those cited by the petitioner. They involved situations where there was public disclosure of the reasons for discharge by the government which necessarily imposed a "badge of infamy" on the employee. *Martinez v. Brown*, 449 F.Supp. 207, 212 (N.D.Cal.1978); *Norton v. Macy, supra; Saal v. Middendorf*, 427 F.Supp. 192 (N.D.Cal.1977). The "badge" in this case, if one exists, was fashioned by the petitioner, not the government.

■ Regardless of whether or not the petitioner's rights to procedural or substantive due process under the Fifth Amendment were violated, the court is empowered to reinstate her on the grounds that the discharge violated her First Amendment rights, if the restrictions imposed upon those rights cannot be justified. *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Elfbrandt v. Russell*, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). As stated in *Perry v. Sindermann, supra:*

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly'. *Speiser v. Randall*, 357 U.S. 513, 526 [, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460]. Such interference with constitutional rights is impermissible." 408 U.S. at 597, 92 S.Ct. at 2697.

" . . . We have applied the principle regardless of the public employee's contractual or other claim to a job . . " *Id.*

Because the petitioner has no "property" or "liberty" interest in her reserve duty, the potential for dismissal based on the exercise of personal freedoms is enhanced. This is so because the real reason for discharge— even an unconstitutional reason—can ordinarily be shielded from scrutiny. See *Shelton v. Tucker*, 364 U.S. 479, 485–6, 81 S.Ct. 247, 250–1, 5 L.Ed.2d 231 (1960); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Therefore, the court must consider her claims that she was discharged in violation of her First Amendment rights and of her constitutionally-protected right to privacy. At the conclusion of the discussion of these issues, the court will consider the substantive due process "nexus" argument of the petitioner.

### The First Amendment

The record is clear that Ms. benShalom is a homosexual. Because she was homosexu-

al she was discharged formally under the terms of paragraph 7–5b(6) A.R. 135–178, but substantively under the spirit of the Army's policy to discharge all known homosexuals. There is no proof that the petitioner engaged in homosexual conduct on or off duty. The government contends, however, that retention of homosexuals like Ms. benShalom will be detrimental to the "unique mission" of the Army, i. e., the protection of the national defense. No proof to support this claim has been offered by the government.

█ It cannot be disputed that the First Amendment protects soldiers as well as civilians.

" . . . while members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." *Carlson v. Schlesinger*, 511 F.2d 1327, 1331 (D.C.Cir.1975), quoting *Parker v. Levy*, 417 U.S. 733, 758, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

In *Schlesinger*, the court went on to hold: "To strike the proper balance between legitimate military needs and individual liberties we must inquire whether 'conditions peculiar to military life' dictate affording different treatment to activity arising in a military context. *Kauffman v. Secretary of the Air Force*, . . . 415 F.2d 991, 997 [D.C.Cir.1969], cert. denied, 396 U.S. 1013 [90 S.Ct. 572, 24 L.Ed.2d 505] (1970)." *Carlson v. Schlesinger, supra*, at 1331.

█ The need for obedience and discipline in the Army requires judicial deference to the military in regulating the conduct of its soldiers. See, *Parker v. Levy, supra*, 417 U.S. at 751, 94 S.Ct. at 2559. The military indeed has a vital mission. It must be prepared at all times to safeguard the national defense. Further, one cannot ignore the "peculiar" conditions inherent in military living arrangements. For these reasons, military regulation of sexual *activity*, at least while on base and on duty, would carry great weight in a balance with the individual liberties of its soldiers.

█ In this case, however, the petitioner was not discharged for any proscribed sexual *activity*. She was discharged because her admissions of homosexuality were sufficient evidence to prove a violation of paragraph 7–5b(6) A.R. 135–178. The petitioner challenges this regulation on the grounds of vagueness. It is not vague. It means exactly what it says. Precisely for that reason, the court concludes that paragraph 7–5b(6) is overbroad.

"A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972).

█ The court is aware of the restricted role the overbreadth doctrine plays in the scrutiny of military regulations. *Parker v. Levy, supra*, 417 U.S. at 758–60, 94 S.Ct. at 2562–63; *Carlson v. Schlesinger, supra*, at 1334. Nevertheless, the extremely broad unconstitutional sweep of this regulation is evidenced by the fact that one such as Ms. benShalom could unquestionably be included within its sweep.

█ If the regulation sweeps so broadly that it infringes on First Amendment freedoms, it is the "delicate and difficult task" of the court to then determine whether the restrictions on those freedoms can be tolerated. *United States v. Robel*, 389 U.S. 258, 264, 88 S.Ct. 419, 423, 19 L.Ed.2d 508 (1967).

"It has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" Id., at 265, 88 S.Ct. at 424.

█ Ms. benShalom engaged in no known homosexual activity. She did not advocate homosexuality to anyone while on duty. Her homosexuality caused no disturbances except in the minds of those who chose to prosecute her. In fact, the record is clear that her sexual preferences made no difference to her immediate supervisors or her students. The court is satisfied from

the record that her sexual preferences had as much relevance to her military skills as did her gender or the color of her skin. The broad sweep of this regulation substantially impinges the First Amendment rights of *every* soldier to free association, expression, and speech.

■ The right of association has long been established. It is implied from the protection expressly provided for free speech, assembly and petition. *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); see, *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

■ This regulation directly infringes on any soldier's right at any time to meet with homosexuals and discuss current problems or advocate changes in the *status quo*, even though no unlawful conduct would be involved. *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 165 (4 Cir. 1976).

■ This regulation further infringes on the fundamental right of any soldier to receive information and ideas about homosexuality. *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). No soldier would dare be caught reading anything that might be construed as a homosexually-oriented book or magazine. No soldier would want to be observed in the company of any person suspected of being a homosexual. Most importantly, no soldier would even want to make any statements that might be interpreted as supporting homosexuality. It is clear that all of these activities would be proscribed by this regulation, and could subject the soldier to dismissal from the service. It is also clear that all of these activities are protected under the First Amendment.

Commendably, the Army rarely enforces this regulation to its letter. However, the specter of its potentially wide sweep poses a threat to the exercise of First Amendment rights by soldiers on the issue of homosexuality. Indeed, Ms. benShalom spoke out and was banished despite her good conduct and undisputed quality as a soldier. The threat to the First Amendment rights of other soldiers who may have only interests in or tendencies toward homosexuality is real. If not a frequently used device for dismissal, this regulation is at least a readily available tool for intimidation and harassment.

■ In the area of First Amendment rights, the government must adopt regulations that are the least intrusive on the individual's liberties. *Broadrick v. Oklahoma*, 413 U.S. 601, 611–2, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973); *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *United States v. Robel*, *supra*, 389 U.S. at 268, 88 S.Ct. at 425.

■ The Army's interests in protecting the national defense, maintaining discipline and upholding the law of obedience under the "peculiar" conditions of military life, are time-honored and given great respect by all courts, including this one. They are, however, substantially outweighed by the "chill" imposed on the First Amendment liberties of its soldiers by this regulation. The court can see no detrimental effect on any legitimate military interest caused by a soldier who merely "evidences" a "tendency, desire or interest" in most anything, including homosexuality.

In speaking to the balance of First Amendment rights with the military's obligation to maintain the national defense, the court, in *Robel*, noted:

"Yet, this concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liber-

ties—the freedom of association—which makes the defense of this nation worthwhile." *United State v. Robel, supra* at 264, 88 S.Ct. at 423–24.

In the case before the court, First Amendment interests carry the day over the needs of the military.

### The Right Of Personal Privacy

Closely intertwined with the First Amendment concepts is the petitioner's claimed right to personal privacy. The court is convinced that the discharge also directly infringed upon this constitutionally-protected interest, and was therefore improper.

█ The right to privacy is rooted in the First, Fourth, Fifth and Ninth Amendments, along with the penumbras of the express provisions in all first eight amendments. *Roe v. Wade,* 410 U.S. 113 at 152–3, 93 S.Ct. 705 at 726, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

As the government has steadfastly contended, the petitioner lost her job simply because of what she is—a homosexual. The difficulty with the government's position is that it fails to make a critical distinction which is made manifest by the facts of this case; the petitioner was treated in the same way as one who openly engages in homosexual *activity*, even though she is "guilty" of nothing more than having a homosexually-oriented *personality*.

Just as some heterosexuals have, throughout human history, chosen to forego sexual activity for a variety of reasons, it cannot be assumed that all who have personalities oriented toward homosexuality necessarily engage in homosexual conduct.

█ The privacy of the integral components of one's personality—the essence of one's identity—this court believes, is an interest so fundamental or "implicit in the concept of ordered liberty" as to merit constitutional protection. *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). As Justice Brandeis stated, in his now famous dissent:

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). See, *Stanley v. Georgia, supra,* 394 U.S. at 564, 89 S.Ct. at 1247.

█ The right of privacy includes the privacy in independently making certain kinds of important decisions. *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).

█ If what the United States Supreme Court itself has termed the right of "personal privacy", *Carey v. Population Services International, et al.,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977); *Roe v. Wade, supra,* 410 U.S. at 152, 93 S.Ct. at 726, means anything, it should safely encompass an individual's right to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as one's personality, self-image, and indeed, one's very identity.

█ The " . . . autonomous control over the development and expression of one's intellect, interests, tastes, *and personality*" (emphasis added) are among the most precious of rights protected by the First Amendment. *Doe v: Bolton,* 410 U.S. 179, 211, 93 S.Ct. 739, 757, 35 L.Ed.2d 201 (1973) (Douglas, J., concurring).

█ As stated above, paragraph 7–5b(6) A.R. 135–178 effectively "chills" the free association of any soldier with known or suspected homosexuals. The right of association is found in the penumbral zone of

privacy created by the First Amendment. *Griswold v. Connecticut, supra,* 381 U.S. at 484, 85 S.Ct. at 1681. Incursion on this right of association, therefore, invades the right to privacy in one's religious, political, economic or cultural associations. See, *NAACP v. Alabama, supra,* 357 U.S. at 460, 462, 78 S.Ct. at 1170, 1171.

■ On a broader scale, the Army's policy of discharging people simply for having homosexual *personalities* also offends privacy interests rooted in the First Amendment.

■ One's personality develops and is made manifest by speech, personal expression and association of one's self with certain persons to the exclusion of others. The Ninth Amendment protects the privacy of one's personality, while the First Amendment protects manifestations of that personality. It is only when one's personality, no matter how bizarre or potentially dangerous, actually manifests itself in the form of unlawful conduct, that the government may intercede in an effort to control the personality or restrict its manifestation. A homosexual personality—formed genetically or by human experience; the product of deliberate choice or predetermination—may be displeasing, disgusting, and immoral to many. These, however, are social judgments, not ingredients for gaging constitutional permissibility.

" . . . Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Stanley v. Georgia, supra,* 394 U.S. at 565, 89 S.Ct. at 1248.

■ While the law remains unsettled as to whether private sexual *conduct* between consenting adults is protected by the right of privacy; cf., *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (E.D.Va.1975), aff'd. 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), with the statements of Justice Brennan in *Carey v. Population Services International, et al.,* 431 U.S. 678, 688 n.5, and 694 n.17, 97 S.Ct. 2010, 2017 n.5, and 2021 n.17, 52 L.Ed.2d 675 (1977), the court believes that constitutional privacy principles clearly protect one's sexual *preferences* in and of themselves from government regulation.

■ Certainly, the "peculiar" nature of military life and the need for discipline gives the Army substantial leeway in exercising control over the sexual conduct of its soldiers, at least while on duty and at the barracks. This court, however, will not defer to the Army's attempt to control a soldier's sexual preferences, absent a showing of actual deviant conduct and absent proof of a nexus between the sexual preference and the soldier's military capabilities. The Army, in this case, has not even tried to show that such a nexus exists.

The peculiar nature of Army life has always required the melding together of disparate personalities. For much of our history, the military's fear of racial tension kept black soldiers segregated from whites. Fear of sexual tensions, until very recently, kept the participation of female soldiers to a minimum. The vital mission of the Army has withstood these changes in racial and heterosexual standards. It should be able to similarly withstand any changes necessary to live without the regulation found to be offensive by the court.

■ In addition to the First Amendment and privacy violations, the court is satisfied that the petitioner's right to substantive due process under the Fifth Amendment has been abridged. This is so despite the fact that Ms. benShalom was afforded procedural due process, as discussed above.

"It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." *Wieman v. Updegraff,* 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952).

This is so even though the employment may otherwise be denied altogether. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); see, *Norton v. Macy, supra.*

"The Government's obligation to accord due process sets at least minimal substantive limits on its prerogative to dismiss its employees; it forbids all dismissals which are arbitrary and capricious . . ." *Norton v. Macy*, 417 F.2d 1161, 1164 (D.C. Cir.1969); see, *Saal v. Middendorf*, 427 F.Supp. 192 (N.D.Cal.1977).

In this instance, not only was the petitioner discharged in violation of her First Amendment and privacy rights, she was also discharged as "unsuitable" for service simply due to her status as a homosexual. The record is very clear that, despite her homosexuality, she was a "suitable" soldier in every respect. It is reasonable to conclude from the extensive record that her performance as a soldier was not only "suitable", it was indeed exemplary. There is absolutely no "nexus" between her status as a homosexual and her suitability for service. *Norton v. Macy, supra; Saal v. Middendorf, supra.*

It was, therefore, arbitrary, capricious and unreasonable for the Army to conclude that the petitioner was anything other than a "suitable" soldier under its regulations.

Ms. benShalom's personality is not disruptive, in no way interferes with her abilities as a soldier, and has had no demonstrated detrimental effect on those with whom she works. Even though she has failed to establish a "liberty" or "property" interest, due process will not countenance her discharge which so clearly invaded interests protected by the Constitution; interests which, under any test, outweigh any interest presented in support of the Army's action.

Therefore, there being no genuine issue of fact that the plaintiff is in all material respects a good soldier who engaged in no improper conduct, the duty of the respondents is clear and the petitioner is entitled to the relief she seeks. The motion of the respondents to dismiss for lack of jurisdiction and for summary judgment on the merits is denied. The motion of the petitioner for summary judgment is granted.

Therefore,

IT IS ORDERED that the Writ of Mandamus issue, and the Department of the Army shall reinstate the petitioner as a member of the Army reserves with all duties, responsibilities and privileges earned by her prior to her discharge.