**Miriam BenSHALOM, Plaintiff,**

v.

**John O. MARSH, Jr., Secretary of the U.S. Army; Commanding Officer H.Q., 84th Division, U.S. Army Reserve; Commanding Officer 5091st U.S. Army Reception Battalion, Defendants.**

**No. 88–C–468.**

United States District Court,
E.D. Wisconsin.

Jan. 10, 1989.

Angermeier & Rogers by Patrick T. Berigan, Milwaukee, Wis., for plaintiff.

Kenneth C. Kohl, Civil Div., Dept. of Justice, Washington, D.C., Francis D. Schmitz, Asst. U.S. Atty., Milwaukee, Wis., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

Sergeant Miriam BenShalom has filed this action seeking to have declared as unconstitutional the Army Reserve Regulation, AR 140–111, Table 4–2, that bars reenlistment to any serviceperson who declares himself or herself to have a homosexual orientation. Sergeant BenShalom is a self-declared lesbian who, on the basis of that declaration, was denied reenlistment by the Army Reserves. The matter is before the court on cross motions for summary judgment. For reasons stated herein, the court finds that Army Reserve Regulation AR 140–111, Table 4–2, violates the plaintiff's first and fifth amendment rights and, therefore, is constitutionally void on its face.

## BACKGROUND

The facts are uncontested. Sergeant BenShalom enlisted in the Army Reserve in November 1974. At various times during her enlistment, she publicly acknowledged that she is a lesbian. On December 1, 1976, she was discharged solely because of her status as a person with a homosexual orientation.

The discharge was effectuated under Army Reserve Regulation AR 135–178, ¶ 7–56(E), which allowed for the discharge of any soldier who "evidences homosexual tendencies, desire, or interest, but is without overt homosexual acts." There was no proof that Sergeant BenShalom had engaged in homosexual acts or had done anything that could be interpreted as a homosexual advance toward another female soldier. By all indications, Sergeant BenShalom was an excellent soldier with an exemplary military record.

Sergeant BenShalom successfully brought a mandamus action seeking reinstatement. Another branch of the district court held that the army regulations then at issue violated her first amendment rights of free speech and association as well as her constitutionally protected right to privacy. *benShalom v. Secretary of Army*, 489 F.Supp. 964, 976 (E.D.Wis.1980) (hereafter *benShalom I*). Vindication, however, was slow in coming. As late as August 1987, seven years after the district court ordered reinstatement, the Army resisted the reinstatement on the ground that the original regulations under which she had been discharged had been reworded.

In ordering her reinstatement, the court of appeals for the seventh circuit stated:

> When BenShalom is returned to the Army, the Army is prohibited from discriminating against her because she professes to be a lesbian ... A change in the Army regulations, which the Secretary now claims would prohibit BenShalom from serving in the Reserves, cannot alter the right of BenShalom which was established in Judge Evans' 1980 opinion.

*BenShalom v. Secretary of Army*, 826 F.2d 722, 724 (7th Cir.1987).

Sergeant BenShalom was finally reinstated in September 1987, almost eleven years after she had been unconstitutionally discharged. Her enlistment period was due to expire on August 11, 1988, and she timely requested reenlistment for a six year term; that request was denied on April 7, 1988. The revised regulations which the Army applied to bar her reenlistment made the status of homosexual a "nonwaivable moral and administrative disqualification." AR 140–111, Table 4–2. Sergeant BenShalom was denied reenlistment on the basis of the same earlier verbal declarations that had previously been the cause of her unlawful discharge.

Sergeant BenShalom filed the instant lawsuit on May 3, 1988. In an effort to preserve the status quo pending resolution of this action, she also filed a motion for a preliminary injunction. The motion was granted on August 3, 1988, 690 F.Supp. 774, and the Army was directed to consider Sergeant BenShalom's reenlistment without regard to her sexual orientation. In response to this court's August 3, 1988, order, the Army considered Sergeant BenShalom's reenlistment request without regard to her sexual orientation and determined that she otherwise satisfies all criteria for reenlistment. Nevertheless, the Army refused to reenlist her; instead, they chose to extend her prior enlistment. After being adjudged in contempt of court on September 1, 1988, the Army finally reenlisted Sergeant BenShalom pending the outcome of this case.

The uncontested factual situation today is very similar to that of 1980. The only real differences are the rewording of the regulations at issue and the fact that Sergeant BenShalom was denied reenlistment instead of being discharged. The basic policy remains the same: the Army considers those people with the *status* of having a homosexual orientation to be incompatible with military service because the Army believes such people, by their statements, demonstrate a propensity to engage in homosexual conduct. Today, as in 1980, there is no allegation that Sergeant BenShalom has engaged in or attempted to engage in homosexual *conduct* of any type.

The Army regulation in question contains a list of numerous "nonwaivable moral and administrative disqualifications" to reenlistment. In that context, Table 4–2 of AR 140–111 places homosexuality in the following category:

> Rule E: Disqualification: Questionable moral character, history of antisocial behavior, sexual perversion, homosexuality (includes an individual who is an admitted homosexual but as to whom there is no evidence that they have engaged in homosexual acts either before or during military service, or has committed homosexual acts), or having frequent difficulties with law enforcement agencies. (see note 1.)

The regulation defines a homosexual as "an individual, regardless of sex, who desires bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification. Any official, private, or public profession of homosexuality may be considered in determining whether an individual is an admitted homosexual." AR 140–111, Table 4–2, note 1. A homosexual act is defined as "bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification, or any proposal, solicitation or attempt to perform such an act." *Id.*

The regulation in question defines a homosexual on the basis of one's sexual desires. Neither the actual commission of a homosexual act nor the intent to commit one is an element of the definition. If a

person, such as Sergeant BenShalom, has the status of having a homosexual orientation and that person engages in speech which discloses or otherwise acknowledges that status, then that person is subject to an automatic, nonwaivable disqualification to reenlistment, regardless whether that person has engaged in or intends to engage in actual homosexual conduct.

The regulation also includes the following caveat:

> Individuals who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity, curiosity, or intoxication, and absent other evidence that the individual is a homosexual, normally will not be excluded from service.

AR 140–111, Table 4–2, note 1.

It follows that the regulation in question does not penalize the commission of homosexual acts *per se*. If a person with a heterosexual orientation engages in homosexual conduct, that person can avoid the consequences of AR 140–111 upon proof of his or her heterosexual orientation. In other words, status based on heterosexual orientation may be a defense to the commission of homosexual acts, and a person with a heterosexual orientation may engage in conduct which is prohibited on the part of a person with a homosexual orientation.

## THE FIRST AMENDMENT

■ The plaintiff argues that AR 140–111, Table 4–2 has the effect of chilling her freedom of expression because if the regulation is enforced, she will no longer be able to make statements regarding her sexual orientation, statements which would otherwise be perfectly legal. In this regard, she points to her earlier case, *ben-Shalom I*, wherein she successfully challenged her prior discharge for making the same statements at issue in the instant case.

The Secretary argues that Sergeant Ben-Shalom's statements about her sexual orientation are not protected expressions. Rather, the statements are admissions that she falls within a classification of people

whose presence in the Army is properly deemed to be incompatible with military service. The Secretary states that "the regulation simply bars from reenlistment any servicemembers who engage, have engaged, or likely will engage, in sexual conduct that Congress has criminalized, *see* 10 U.S.C. § 925 [sodomy], and that the military has deemed is incompatible with the military mission." Defendants' Memorandum in Support of its Motion at 24–25. The Secretary concludes that the regulation "protect[s] a substantial Government interest unrelated to the suppression of free expression." *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, ——, 62 L.Ed.2d 540 (1980). The Secretary asserts that by acknowledging that one has a homosexual orientation, one admits that one is likely to engage in criminal acts of sodomy, and there is a substantial government interest in preventing such criminal acts.

The Secretary further argues that *ben-Shalom I* did not hold that Sergeant Ben-Shalom's first amendment rights were violated by her discharge for statements that she made about her sexual orientation. Rather, the Secretary asserts that the Army's previous regulation was struck down under the first amendment overbreadth doctrine. This contention is unpersuasive and squarely contradicted by Judge Evans' ruling in *benShalom I*:

> [T]he court is empowered to reinstate her on the grounds that the discharge violated her First Amendment rights, if the restrictions imposed upon those rights cannot be justified. [citations omitted] As stated in *Perry v. Sindermann, supra* [408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972)]: "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—espe-

cially, his interest in freedom of speech...."

*benShalom I,* 489 F.Supp. at 972.

Judge Evans then made the reference to the overbreadth doctrine as indicated by the defendants, but added:

Nevertheless, the extremely broad unconstitutional sweep of this regulation is evidenced by the fact that one such as Ms. BenShalom could unquestionably be included within its sweep.

If the regulation sweeps so broadly that it infringes on First Amendment freedoms, it is the "delicate and difficult task" of the court to determine whether the restrictions on those freedoms can be tolerated.

*benShalom I,* 489 F.Supp. at 973.

Other courts have similarly interpreted *benShalom I* to have held that Sergeant BenShalom's statements constituted protected speech. *BenShalom v. Secretary of Army,* 826 F.2d 722, 724 (7th Cir.1987) ("The district court held in its 1980 opinion that BenShalom had a First Amendment right to claim to be a lesbian."); *accord, Watkins v. Army,* 847 F.2d 1329, 1334–35 (9th Cir.1988), *reh'g en banc ordered,* 847 F.2d 1362 (9th Cir.1988); *Matthews v. Marsh,* No. 82–0216P, slip op. at 18, 21 (D.Me. April 3, 1984); *but see Pruitt v. Weinberger,* 659 F.Supp. 625, 627 (C.D.Cal. 1987).

*benShalom I* held that Sergeant BenShalom's statements were protected speech, and the Secretary may not be heard now to assert the contrary. *Eilrich v. Remas,* 839 F.2d 630, 633 (9th Cir.1988). However, the protection of the first amendment in military life is not coextensive with that of civilian life. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Thus, we arrive at the crucial questions: first, whether the regulation protects a substantial government interest; and second, whether the regulation restricts speech no more than is reasonably necessary to protect the substantial government interest. *Brown v. Glines,* 444 U.S. 348, 353–55, 100 S.Ct. 594, 598–600, 62 L.Ed.2d 540 (1979).

*Glines* involved the on-base circulation of a petition among service personnel in violation of an air force regulation that required prior authorization for distribution of written material by the base commander. The substantial government interests in *Glines* that justified dilution of first amendment protections in the military context were the "overriding demands of discipline and duty ... [which are] vital prerequisites for military effectiveness." *Glines,* 444 U.S. at 354, 100 S.Ct. at 599. The loss of control by a base commander over written material distributed to service personnel was held to diminish his ability to avert potential disruptions and maintain internal discipline. *Glines,* 444 U.S. at 357, 100 S.Ct. at 601. Only written materials that "pose[d] a clear danger to the good order of [the] troops" were the target of the regulation. *Id.*

The Secretary asserts that the substantial government interests that are protected by the regulation in the instant case are the ability of the military to:

a. Maintain discipline, good order and morale.

b. Foster mutual trust and confidence among service members.

c. Insure the integrity of the system of rank and command.

d. Facilitate assignment and worldwide deployment of service members who frequently must live and work under close conditions affording minimal privacy.

e. Recruit and retain members of military service.

f. Maintain the public acceptability of military service.

g. Prevent breaches of security.

AR 135–178, ¶ 10–2.

There can be no serious question that the foregoing government interests are substantial. Certainly they constitute "vital prerequisites for military effectiveness." *Glines,* 444 U.S. at 354, 100 S.Ct. at 599. Thus, the first part of the test, as stated in *Glines,* is satisfied to the extent that the Secretary has invoked substantial government interests.

The question, therefore, narrows to whether the regulation sweeps more broadly than is reasonably necessary to protect the asserted government interests. The

regulation is premised on the following policy:

> Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct, or who by their statements demonstrate a propensity to engage in homosexual conduct, seriously impair the accomplishment of the military mission. The presence of such members adversely affects the ability of the service to [accomplish the enumerated government interests].

AR 135–178, ¶ 10–2.

The policy as enunciated in AR 135–178, ¶ 10–2, targets two groups of people for regulation: first, those who engage in homosexual conduct and second, those who by statements demonstrate a propensity to engage in homosexual conduct. A statement that acknowledges that one has a homosexual orientation places one in the second group even though there be no additional evidence of propensity. This is precisely what has happened to the plaintiff herein. The inclusion of persons who, by their statements, acknowledge that they have a homosexual orientation within the sweep of the regulation causes the regulation to fail the second part of the test enunciated in *Glines*. In *benShalom I*, Judge Evans wrote:

> Ms. BenShalom engaged in no known homosexual activity. She did not advocate homosexuality to anyone while on duty. Her homosexuality caused no disturbances except in the minds of those who chose to prosecute her. In fact, the record is clear that her sexual preferences made no difference to her immediate supervisors or her students. The court is satisfied from the record that her sexual preferences had as much relevance to her military skills as did her gender or the color of her skin. The broad sweep of this regulation substantially impinges the First Amendment rights of *every* soldier to free association, expression, and speech.

*benShalom I*, 489 F.Supp. at 973–74.

The only legally significant difference between the facts confronting the court in *benShalom I* and the facts confronting us today is the rewording of the regulation in question. In *benShalom I*, the regulation allowed for the discharge of any soldier who "evidences homosexual tendencies, desire, or interest, but is without overt homosexual acts." *Id.* at 969. The Secretary has revised the regulation so that it no longer affects those who evidence "tendencies" or "interest" in homosexuality. However, the regulation today continues to affect those who by statements that they have a homosexual orientation acknowledge a "desire" for homosexual conduct. Such a "desire," in the view of the Secretary, belies a propensity to engage in actual homosexual conduct. In this regard Judge Evans accurately observed:

> Just as some heterosexuals have, throughout human history, chosen to forego sexual activity for a variety of reasons, it cannot be assumed that all who have personalities oriented toward homosexuality necessarily engage in homosexual conduct.

*benShalom I*, 489 F.Supp. at 975.

Just as was the case in *benShalom I*, the court today "can see no detrimental effect on any legitimate military interest caused by a soldier who merely 'evidences' ... a ... 'desire or interest' in most anything, including homosexuality." *Id.* at 974. The Secretary has offered the court no basis to support the contention that acknowledgment of status equals reliable evidence of propensity. The court is asked to rely on the "obvious connection" and to use "commonsense." In this context, the word "commonsense" amounts to little more than a euphemism for prejudice. The court must decline to give such bias a sanctuary in our constitutional jurisprudence. The regulation is facially violative of the first amendment because it unreasonably chills the right to freedom of speech of individuals such as the plaintiff.

## EQUAL PROTECTION

■ Sergeant BenShalom claims that her fifth amendment right to equal protection of the law is violated by Army Reserve Regulation AR 140–111, Table 4–2. She

argues that the regulation is subject to heightened scrutiny because homosexuals, as defined by the *status* of having a particular sexual orientation and absent any allegations of sexual *misconduct*, constitute a suspect class. A regulation based on such a classification, she argues, must fail because it is not necessary to achieve a compelling state end. Alternatively, Sergeant BenShalom argues that the regulation fails rationally to further a legitimate, articulated state purpose.

The Secretary argues that homosexuals are not a suspect class. But in the event that homosexuals are held to be a suspect class, the Secretary contends that the regulation does not violate the equal protection clause because it satisfies the test of heightened scrutiny since it furthers compelling government interests. Finally, the Secretary asserts that the correct approach is to uphold the constitutionality of the regulation under the traditional test of deferential scrutiny because the regulation rationally furthers several legitimate state interests.

The equal protection clause of the fourteenth amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The equal protection clause is made binding upon the federal government by the fifth amendment's due process clause, *Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1953), and "fifth amendment equal protection claims are treated precisely the same as equal protection claims under the fourteenth amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

It is a general rule that government regulations will be presumed to be valid under the equal protection clause as long as the classification drawn by the regulation "rationally furthers some legitimate, articulated state purpose." *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1972). Under this deferential standard of scrutiny, the classification is tested for a general relationship to the articulated state purpose, and it matters not that an individual member of the burdened class proves to be an exception. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 310–11, 96 S.Ct. 2562, 2565–66, 49 L.Ed.2d 520 (1975). This judicial deference is grounded in a constitutional presumption that "improvident [classifications] will eventually be rectified by the democratic processes." *Cleburne v. Cleburne Living Center Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1984).

When a regulation creates classifications based on race, alienage or national origin, judicial deference gives way to heightened scrutiny. These classifications are considered suspect because they are based on "factors which are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.

The debate over whether sexual orientation constitutes a suspect or quasi-suspect classification has been blurred by a failure adequately to differentiate between classifications based on conduct and those based on status. The regulation at issue in this case creates a classification based entirely on status. AR 140–111, Table 4–2, cannot be characterized as a classification based on conduct. The issue before the court is whether homosexuals, defined by the *status* of having a particular sexual orientation and absent any allegations of sexual *misconduct*, constitute a suspect or quasi-suspect class.

In *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Court held that there is no constitutionally protected privacy right to engage in consensual acts of homosexual sodomy. The court of appeals for the ninth circuit has noted that:

[A]lthough *Hardwick* held that the due process clause does not prevent states from criminalizing acts of homosexual sodomy, [cite omitted], nothing in *Hardwick* actually holds that the state may make invidious distinctions when regulating sexual conduct....

. . . .

While it is not our role to question *Hardwick's* concerns about substantive due process and specifically the right to privacy, these concerns have little relevance to equal protection doctrine. The right to equal protection of the laws has a clear basis in the text of the Constitution.

*Watkins v. U.S. Army,* 847 F.2d 1329, 1340, 1341 (9th Cir.1988).

In *Padula v. Webster,* 822 F.2d 97, 102 (D.C.Cir.1987), the court decided that homosexuals were not a suspect or quasi-suspect class "when defined as persons who engage in homosexual conduct." The court was careful to stress that the classification then under scrutiny "focus[ed] only on homosexual conduct, not homosexual status." *Id.* The *Padula* court held that the Supreme Court's decision in *Hardwick* foreclosed efforts to make *practicing* homosexuals a suspect class. *Padula,* 822 F.2d at 103.

In an equal protection context, *Padula* and *Hardwick* can only be reasonably construed as standing for the proposition that classifications are not subject to strict scrutiny when defined by homosexual conduct that rises to the level of criminal sodomy. *Doe v. Casey,* 796 F.2d 1508, 1522 (D.C.Cir. 1986) ("[*Hardwick* ] did not reach the difficult issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation.*") (emphasis in the original). In *Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985), the court rejected an equal protection claim challenging a Texas statute that criminalized homosexual sodomy. The court declined to hold that homosexuals, defined by conduct, constituted a suspect or quasi-suspect class. *Id.* In denying a petition for rehearing en banc, the court took care to distinguish between conduct and status by noting that "[t]he statute is directed at certain conduct, not at a class of people." *Baker v. Wade,* 774 F.2d 1285, 1287 (5th Cir.1985).

In *Watkins v. U.S. Army,* 847 F.2d 1329, 1349 (9th Cir.1988), *reh'g en banc ordered,* 847 F.2d 1362 (9th Cir.1988), the court held that homosexuals constitute a suspect class when defined by status. The facts in *Watkins* are very similar to those in the instant case; both cases involved essentially the same army regulation that makes homosexuality a nonwaivable bar to reenlistment.

Homosexuals have suffered a history of purposeful discrimination. Justice Brennan has noted that "homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely ... to reflect deep-seated prejudice rather than ... rationality.' " *Rowland v. Mad River Local School District,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1377, 84 L.Ed.2d 392 (1985) (dissenting from denial of cert.). Such hostility is evident in the very pleadings in this case wherein homosexuals are analogized to kleptomaniacs and arsonists. *See* Defendants' Memorandum in Reply to Plaintiff's Brief in Opposition to Motion to Dismiss, p. 10.

The Secretary has continuously characterized homosexuals as a group defined by the desire and intent to engage in criminal acts of sodomy. Yet not one shred of evidence has been presented to the court to show that homosexuals as a group share a compelling desire to commit that particular form of sexual conduct. The court is asked by the Secretary to hold that homosexual orientation is inherently intertwined with a desire and intent to commit criminal acts of sodomy. To do so is to create a class based on prejudicial notions of what homosexuals are supposedly like. This type of discrimination, based on unsupported stereotypes, is precisely the type of discrimination that requires enhanced judicial scrutiny. *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3245; *High Tech Gays v. Defense Indust. Sec. Clear. Off.,* 668 F.Supp. 1361, 1369 (N.D. Cal.1987).

It is also clear that a class based on homosexual orientation is defined by a trait that bears no relationship to an individual's ability to contribute to the good of society. In *benShalom I,* Judge Evans held that:

> [T]he record is clear that [BenShalom's] sexual preferences made no difference to her immediate supervisors or her stu-

dents. The court is satisfied from the record that her sexual preferences had as much relevance to her military skills as did her gender or the color of her skin. *benShalom I, supra,* 489 F.Supp. at 973–74; *accord, Watkins, supra,* 847 F.2d at 1346; *High Tech Gays, supra,* 668 F.Supp. at 1369–70.

In only a very few communities do homosexuals possess the political power effectively to obtain redress from invidious discriminations in the political arena. It is estimated that homosexuals constitute between 8% and 15% of the population. *Rowland v. Mad River Local School District,* 470 U.S. 1009, 1014 n. 7, 105 S.Ct. 1373, 1377 n. 7, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of cert.). Homosexuals constitute a discrete and insular group subject to potential prejudicial political power. *Watkins, supra,* 847 F.2d at 1348–49.

The court concludes that homosexuals, as defined by the status of having a particular sexual orientation, constitute a suspect class for the purposes of the equal protection doctrine. However, it is unnecessary for the court to subject the classification to strict scrutiny because the court finds that the classification fails even the most deferential standard of review. The classification is not rationally related to any articulated legitimate government interest. *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1972).

■ The court recognizes that the government interests articulated by the Secretary are indeed compelling. The problem is that none are rationally advanced by an Army regulation which distinguishes military personnel on the basis of their sexual orientation. The elimination of all soldiers with homosexual orientations from the ranks of the Army is not rationally related to the advancement of any compelling government interest. It has already been noted that sexual orientation is a trait that bears no relationship to an individual's ability to perform or contribute to the military, and it is not rational to hold that there is a general relationship between the trait upon which the classification is based and the advancement of any of the articulated military interests.

The military does have a legitimate interest in the regulation of sexual *conduct* of service personnel. It is reasonable to say that regulation of sexual behavior is rationally related to each of the articulated government interests. But such regulation must be targeted at the conduct itself and cannot be based on prejudicial stereotypes of what people with certain orientations are like.

The challenged regulation can survive deferential scrutiny only if the Secretary is correct in the assertion that the status-conduct distinction is bogus. The Secretary insists that the regulation is aimed at conduct and that we must presume a correlation between orientation and conduct. I disagree.

In *Baker v. Wade,* 774 F.2d 1285, 1287 (5th Cir.1985), the court noted that "[t]hough the conduct be the desire of the bisexually or homosexually inclined, there is no necessity that they engage in it." In *Cyr v. Walls,* 439 F.Supp. 697, 702 (N.D. Tex.1977), the court stated that it "can take notice of the logical distinction between gay individuals who simply prefer the companionship of members of their own sex and homosexual individuals who actively practice homosexual conduct."

■ A prevailing party in any civil action against the United States, or any agency or any official of the United States acting in his or her official capacity, is entitled to a reasonable attorney's fee unless the position of the United States was substantially justified or other conditions exist which would make an award unjust. 28 U.S.C. § 2412. In the case at bar, the plaintiff is clearly the prevailing party in all respects. It is equally clear that the position taken by the United States was not substantially justified. Accordingly, the plaintiff will be allowed 30 days from the date of this decision and order to serve and file her application for fees and other expenses in accordance with 28 U.S.C. § 2412(d)(1)(B). The government will be allowed 10 business days from the date of the filing of the

application to serve and file its objections, if any, concerning the reasonableness of the requested amount.

## CONCLUSION

Therefore, IT IS ORDERED that the defendants' motion for summary judgment be and hereby is denied.

IT IS ALSO ORDERED that the plaintiff's cross motion for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED that Army Reserve Regulation AR 140–111, Table 4–2, be and hereby is declared unconstitutional on its face.

IT IS FURTHER ORDERED that the defendants be and hereby are directed to continue Sergeant BenShalom's reenlistment without regard to her sexual orientation.

IT IS FURTHER ORDERED that the clerk of this court enter judgment in favor of the plaintiff, with costs.