**Jane DOE, Plaintiff,**

v.

**Gary SPARKS, Warden of the Blair County Prison, et al., Defendants.**

**Civ. A. No. 89–248J.**

United States District Court, W.D. Pennsylvania.

March 14, 1990.

Jere Krakoff, Mary Lewin, Pittsburgh, Pa., for plaintiff.

Michael Chorazy, Hollidaysburg, Pa., for defendants.

## MEMORANDUM

D. BROOKS SMITH, District Judge.

This case requires our review of the visitation policy of the Blair County Prison in light of plaintiff's challenge that the policy is unconstitutional and in violation of the Fourteenth Amendment's equal protection clause.

Plaintiff is an adult female sentenced to incarceration in the Blair County Prison. She alleges that the institution's visitation policy unconstitutionally discriminates against her because she is a lesbian and is denied any visit from the woman with whom she is romantically involved. Routine visits are permitted between heterosexual prisoners and members of the opposite sex with whom they are romantically involved.

The matter came before the court for a preliminary and final injunction hearing on December 14, 1989. Having reviewed the transcript and our notes from that proceeding, together with the post-trial submissions of counsel, we issue the following findings and conclusions:

## FACTS:

1. Jane Doe is an adult female inmate of the Blair County Prison, who will be identified by a pseudonym so as not to unduly expose plaintiff's identity. Doe is a lesbian, and is and has been involved in a romantic[1] relationship with another adult fe-

---

1. Throughout this memorandum the Court uses terms such as "romantically involved" and

male who is not incarcerated and who would visit Doe at the prison if permitted.

2. Doe was sentenced by the Blair County Court of Common Pleas, and was committed to the Blair County Prison on May 25, 1989. Visitation in the prison is governed by a Prison Board-approved policy which has been effective and unaltered since the early 1970's, and which is set forth in the handbook distributed to inmates upon arrival at the prison. It provides, in relevant portion, that:

Inmates will be permitted two (2) one hour visits each week, one on either Tuesday/Wednesday and one on either Saturday/Sunday.

Visitation is limited to members of the immediate family, i.e.: mother, father, sister, brother, wife, husband, children. If inmate is not legally married, common law spouses or boy/girlfriend will be permitted to visit.

3. On May 29, 1989, Doe sent a request to Warden Gary Sparks requesting that her girlfriend be allowed to visit her. Warden Sparks refused the request, replying that such relationships could not be condoned in a prison setting.

4. The Warden's rejection of the requested visitation was in accordance with the Warden's interpretation of the Blair County Prison policy which permitted visits between unmarried heterosexual inmates and their boy/girlfriends, but which did not permit visits between homosexual inmates and their boy/girlfriends.

5. Significantly, although the parties stipulated that the Warden's rejection of the visit was due to a prison policy, the evidence presented at the hearing showed that in the past 15 years, and within the memory of any member of the prison staff or Board, no request for visitation between a known homosexual inmate and a boy/girlfriend had ever occurred. The Warden denied the request based on what he believed

the visitation policy to require and on the basis of his understanding of Pennsylvania law.

6. The day following Doe's initial request, Doe sent another written request to the Warden asking for an explanation of the denial of visiting privileges. That same day, May 30, 1989, the Warden responded in writing to Doe, stating in part:

[B]eing an administrator of a penal institution I can't condon[e] such a relationship and permit it to be extended through visits within the prison. When you are out of jail you can do what you want, but while you are here you will act according to the laws of Pennsylvania.

7. In August, 1989, after a third written request from Doe to the Warden for visitation with her girlfriend, Sparks brought the matter to the attention of the Prison Board, which ratified the actions of the Warden. This lawsuit followed when plaintiff filed her complaint on October 30, 1989.

8. Visitation at the Blair County Prison is noncontact only, and occurs in a visiting area containing thirteen pairs of booths separated by plexiglass panes; the visitor communicates through a telephone speaker. The booths are three-sided, and are not enclosed. The sides of a booth extend back approximately eighteen inches from the glass. Visitors' names and relationships to inmates are not announced to the prison population, nor are they otherwise publicized.

### Discussion

Most of the facts which are necessary to resolve this case are not in dispute between the parties. In fact, the bulk of the evidence presented at the trial—that from plaintiff's witness Donna Gority who is also a member of the Prison Board, and plaintiff's expert, John Buckley—was either irrelevant or of no aid in reaching our disposition of this case. Aside from contributing her sociological viewpoint, Gori-

"boy/girlfriend". We mean by these terms a relationship which is more than a friendship and which includes a sexual aspect, whether that implies intimate contact or some less physical conduct. This matter does not involve any question of sexual orientation alone. The

Warden and Doe do not dispute, and we find as a fact, that visitation at the Blair County Prison is not denied on the basis of sexual orientation under the challenged policy. Tr. 68–69 (Warden Sparks).

ty's testimony was pointless, since it expressed neither relevant facts concerning the actions of the Prison Board nor an understanding of the legal issues involved.[2] Buckley's testimony, which focused entirely on the merits of the Prison Board policy, was also unhelpful in its entirety. He did little more than to repeatedly point out that "[v]isitation is the most important activity an inmate has in the prison", a matter which was undisputed and irrelevant to the constitutional issue, and that "in prison the strong prey on the weak", a statement which we deem to be little more than a tautology.

■ We begin as we must, by deciding whether we have jurisdiction of this matter. As the Supreme Court has observed:

Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive branches of Government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). (citation omitted)

This admonition to be deferential is particularly forceful in the area of prison visitation. To hold otherwise would be to appoint the federal judiciary to supervise visitation at every penal institution, a delegation for which neither competence nor constitutional authority is extant. In short, a deferential approach is required if "prison

administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977).[3]

Nevertheless, even as the Supreme Court dictated a deferential role for the federal judiciary in *Turner v. Safely*, it struck down a Missouri prison policy which prevented inmates from marrying without the permission of the warden as offending the First Amendment, stating as it did so:

[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates.

*Id.*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64, citing *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Cf. *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (APA insulates discretionary employment decisions of CIA Director from judicial review, except on constitutional grounds).

■ Because this matter presents a challenge to a nondiscretionary policy which requires Blair County prison officials to allow visitation to unmarried heterosexual inmates and their boy/girlfriends and forbids visitation to homosexual inmates and their boy/girlfriends, and not to any particular decision concerning visitation at the Blair County Prison, and because that distinction is challenged under the Equal Protection Clause of the Fourteenth Amendment, we hold that we have jurisdiction to rule on this matter. We emphasize that our power to hear this case is solely to rule on the constitutional validity of the Prison Board policy, not to decide whether plaintiff Doe should receive visitation from her girlfriend.

---

**2.** This Court sits not as a legislative body to decide the wisdom of any prison policy, but rather as a juridical tribunal passing upon the constitutionality of such a policy. Too much mischief can be generated by a jurisprudence which selects a result based on a judge's view of the merits and works backward toward a rationale. We eschew such an approach.

**3.** If the quintessentially discretionary task of deciding that a particular inmate should not have a particular visitor were subject to constitutional challenge, under applicable standards for proof of a prima facie case of discrimination, all visitation decisions would become subject to a colorable federal challenge if either the inmate or proposed visitor were a member of a minority racial, ethnic, religious, or political group.

Defendant Sparks asserts that there is no federal constitutional protection afforded to homosexual conduct, citing *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and that a decision to deny visitation to a homosexual inmate's boy/girlfriend can offend no federal constitutional provision. Plaintiff argues, on the other hand, that visitation at the Blair County Prison is neither conjugal nor contact, and that in any event *Bowers v. Hardwick*, which stated that no substantive element of the due process clause prevented a state from criminalizing homosexual sodomy, is not a precedent which allows a state or county prison to refuse visitation to homosexuals who wish to associate romantically with other homosexuals. Both parties miss the mark somewhat.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall deny the equal protection of the laws to any person within its jurisdiction. Both sides would admit that the equal protection clause dictates equal administration of rights and privileges, such as visitation, between similarly situated persons. Both sides would also admit that, constitutionally speaking, plaintiff is not a member of a "suspect class" which requires strict scrutiny and a compelling governmental reason to justify any intentionally disparate treatment. But see *Watkins v. United States Army*, 875 F.2d 699, 716–28 (9th Cir.1989) (concurring opinion of Norris, J.) Plaintiff, however, would argue that she is, because she is a homosexual, a member of a class which is deserving of at least a lower tier "rational basis" scrutiny. Plaintiff asserts that in order to justify under the federal equal protection clause disparate treatment of homosexual inmates' visitation claims, the difference in treatment must be "reasonably related" to the differences between heterosexual and homosexual inmates.

To date, four circuits have held that the equal protection component of the Fifth Amendment, which is co-extensive with the equal protection clause of the Fourteenth Amendment applicable here, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975), requires at most a rational relationship to

permissible ends scrutiny for regulations which discriminate against homosexuals on the basis not only of conduct, but also in some cases mere orientation. *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 565, 571 (9th Cir.1990); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989) cert. denied, —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir.1989), cert. denied, —— U.S. ——, 110 S.Ct. 1295, 108 L.Ed.2d 473 (February 27, 1990); *Padula v. Webster*, 822 F.2d 97, 103 (D.C.Cir.1987). In each case, the Courts of Appeals found that disparate treatment of heterosexual and homosexual conduct (or orientation alone in the case of *Ben–Shalom*, see *id.*, 881 F.2d at 464) by the Department of Defense (*High Tech Gays*), the Army (*Ben–Shalom*), the Navy (*Woodward*), and the FBI (*Padula*) was justifiable under a rational basis test, and had no occasion to consider whether a federal equal protection clause challenge to discrimination against homosexuals might be unsuccessful even in circumstances where government regulation bore no rational relationship to a government policy.

It seems to us contradictory to hold that a class which is not entitled to any substantive protection under the due process clause is nevertheless entitled to status under the federal constitution as a class for equal protection purposes. See e.g. *Padula v. Webster*, 822 F.2d at 103, recognizing that there is no constitutional infirmity in simply criminalizing homosexual conduct, but nonetheless subjecting less severe state action which discriminates on the basis of homosexual conduct to a rational basis to legitimate ends scrutiny. 822 F.2d at 103–104.

To illustrate the point, consider plaintiff's argument that a class which is afforded no substantive due process protection may be a class for equal protection purposes, as applied to the perhaps less emotionally charged question of whether tobacco smoking should be banned. A state might certainly criminalize tobacco smoking under its police powers without a chal-

lenge that it infringed upon any federal substantive due process right. A smoker could, however, consistent with plaintiff's theory (and Judge Silberman's statement that all government practices must meet the rational basis standard, 822 F.2d at 104) bring a colorable challenge to the tobacco ban on the ground that the ban affected the class of smokers differently from nonsmokers. Plaintiff's theory would result in a federal district court having the power to review under the rational basis test every single piece of legislation passed by a federal, state, or municipal body. This should be enough to illustrate its falsity.

■ We hold that conduct which is not in itself protected by substantive due process, natural right, or some source of substantive protection cannot be the basis of an equal protection challenge by the class which engages in the conduct.

■ In our federal system, the federal constitution is not the only source of substantive law. The Commonwealth of Pennsylvania, consistent with its status as an independent sovereign, is free to pass laws, so long as they do not run afoul of the federal supremacy clause, which create substantive rights and immunities. As defendant acknowledges in his post-trial brief, some states have enacted comprehensive statutes banning discrimination against homosexuals. And see *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 565, 574 n. 10 (9th Cir.1990). The relevant question in our inquiry here must be to what extent has Pennsylvania defined the class at issue.

In *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980), a 4–3 majority of the Pennsylvania Supreme Court invalidated Pennsylvania's *voluntary* deviate sexual intercourse statute, 18 Pa.C.S. § 3124 (1973), as attempting to reach conduct beyond the police power of the state government. As an additional reason for invalidating the statute, four justices also held that the statute offended the equal protection clause, although they did not specify whether they referred to the federal consti-

tution or to Article I, Section 26 of the state's constitution.

■ Certainly after *Bowers v. Hardwick*, and probably after *Bonadio* itself, the Pennsylvania legislature could have drafted a constitutionally sound sodomy statute, had *Bonadio* rested solely on equal protection grounds as Justice Flaherty claimed. 415 A.2d at 49 n. 2. The opinion, however, specifically removed from the ambit of Pennsylvania law, the enforcement of legal sanctions against all private sexual conduct between consenting adults which hitherto had constituted sodomy. 415 A.2d at 50–51. Although the effect of *Bonadio* was not to create a "right" to sodomy, it certainly established that the class of adult persons who engage in oral or anal sex with other consenting adults, whether hetero-, homo-, or bi-sexual in orientation, are immune from state interference. We therefore must certainly find that if the Pennsylvania Supreme Court currently holds that it is beyond the power of Pennsylvania's legislature to prohibit adult private consensual homosexual conduct, the federal equal protection clause requires at least a showing of a rational relationship to a permissible end for any Pennsylvania governmental policy which requires disparate treatment for persons who were not seeking to engage in legally permissible sexual conduct, but merely to acknowledge the existence of a homosexual affectional or romantic relationship.

The Warden of Blair County has asserted that security and discipline are the two ends to which the visitation policy is directed. We find from the evidence presented that the Warden's sincere interest is solely in running an orderly and safe prison in a system which, although not as overburdened as some, is facing overcrowding on an ongoing basis. We note further that even if plaintiff were to have proved some sort of personal animus on the part of the Warden, it would be irrelevant to the constitutional issue here presented.

■ The Warden explained that the policy against visitation between a homosexual inmate and boy/girlfriend was designed both for the protection of the homosexual

inmate, (typically the male homosexual prisoner), who if identified as homosexual might be targeted for assaults and abuse by other prisoners, and for the prevention of the discipline and health problems that official approval of homosexual relationships between inmates and visitors would create by implicitly condoning consensual homosexual relationships between inmates. Both concerns are obviously valid, and the policy against homosexual inmates receiving visits from their boy/girlfriends does bear a rational relationship to preventing the ills the Warden described. However, the existence of countervailing policies within the system in effect at the Blair County Prison so undercuts the effectiveness of the policy against visitation as to render it constitutionally infirm.

As we have stated, the policy of disallowing visitation by boy/girlfriends of homosexual inmates bears some rational relationship toward the goal of internal security, in the sense that the reduction of the amount of information which would possibly identify an inmate as homosexual also reduces the probability that that inmate could be targeted for harassment or abuse by other prisoners. See, e.g., *Thornburgh v. Abbott*, —— U.S. ——, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989) (possession of homosexual pornography). However, the multiplicity of permissible sources of information to other inmates that Jane Doe or any inmate is or appears to be homosexual makes the additional information that might possibly be disclosed through a chance observation while a homosexual inmate's boy/girlfriend is privately visiting during the two hours per week maximum allowed for visitation practically negligible. This is doubly so when one considers the paramount fact that first and foremost what would be used to 'identify' an inmate as a homosexual (whether that inmate is or is not) by fellow inmates is appearance and behavior during the 166 hours per week when that inmate is not receiving visitors.

This is triply so when one also considers that the testimony in this matter indicated that it was apparently permissible under prison policy for women inmates to possess openly pornographic photomagazines of women. This is quadruply so when one considers that a homosexual inmate could quite permissibly receive visits from a homosexual visitor at the discretion of the Warden, so long as the visitor were not romantically involved with the inmate.

■ It also is rational to expect that official disapproval of visits between homosexual inmates and their boy/girlfriends communicates the message that homosexual activity between inmates is disapproved.[4] The converse which the defendant proposes, however, that permission for homosexuals to visit their inmate boy/girlfriends would effectively negate or even water down the official ban on homosexual conduct in jail, lacks any meaningful support. The evidence shows that inmates are free to receive correspondence from their boy/girlfriends, including love letters containing sexual themes and pornographic materials. The fact that publicly acknowledged communications with a homosexual boy/girlfriend are permissible without official concern that this will condone homosexual activity inside the prison makes official concern that a noncontact visit with a boy/girlfriend will condone that activity unpersuasive.

More importantly, visitation between a heterosexual inmate and a spouse or boy/girlfriend is beneficial and advocated because maintaining outside romantic interests dissuades prisoners from turning to homosexual relationships within prison. It would be illogical to assume that a homosexual inmate would contrarily be more likely to turn to other inmates because his ties to an outside romantic interest are strengthened. Further, it would be unrealistic to say the least to suppose[5] a hetero-

---

**4.** It goes without saying that prohibition of even consensual homosexual activity is a practical necessity of prison administration, whether for health or discipline reasons, or from the realistic expectation that coerced sexual activity, which the evidence indicated does take place in prison, would be defended on the ground that it was consensual.

**5.** Prominent in the above analysis are words such as "assume" and "suppose". It is important to note that we are not, in the above hypo-

sexual inmate would be more likely to be sexually attracted to another inmate simply because he, again by chance, observed a homosexual inmate receiving a visit from his boy/girlfriend.

Finally, the Warden stated that the ban on homosexual visitation also was necessary to prevent same-sex friends of inmates from falsely representing that they were romantically involved with an inmate in an attempt to visit that inmate. We suspect that this is at best a make-weight argument, but in any case find it to be invalid. The Warden, whether dealing with a request from a heterosexual or homosexual inmate, must exercise the same amount of his discretion in deciding whether the non-family visitor qualifies for visitation as a true boy/girlfriend.[6]

The Supreme Court in *Turner v. Safley* articulated the following four considerations as guidelines in determining whether a given prison policy was valid—i.e. reasonably related to legitimate penological interests despite its impact on a constitutional right (including the right to equal protection):

1. Is there a 'valid rational connection' between the regulation and the interest put forth to justify it, and is the government interest valid? *Turner v. Safley*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62 (citing *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)).

2. Are there other avenues open to the prisoner to exercise the asserted right? *Id.* (citing *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977)).

3. What impact would accommodating the prisoner have on prison administration? *Id.* See also *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987).

4. Are there ready alternatives available to prison officials? See *Turner v. Safley*, 482 U.S. at 90–91, 107 S.Ct. at 2262–63.

We have no hesitation in concluding from our review of the evidence in this matter that the logical connection between the Blair County visitation policy as it is interpreted and the asserted goals of maintaining internal security and safety for inmates is so remote as to be arbitrary. Although plaintiff has other available avenues for remaining in contact with her girlfriend, and would not be unduly burdened by a denial of visitation, the impact on other prisoners of accommodating the plaintiff, as we have discussed above, would be practically insignificant. The burden on the prison administration resulting from allowing visitation would likewise be almost nonexistent.

The visitation policy cannot stand. An appropriate Order will be entered.

### ORDER

AND NOW, this 14th day of March, 1990, consistent with the foregoing Memorandum, it is hereby

ORDERED that defendants' Motion to Dismiss is denied in part for mootness due to the filing of an Amended Complaint seeking only declaratory and injunctive relief, and denied on the merits insofar as it seeks dismissal for failure to state a claim; and it is further

---

theticals, attempting to substitute our judgment for that of the Warden and Prison Board, for the simple reason that the visitation policy is not based on any judgment at all, at least in the sense that "judgment" means conclusion based on an evaluation of experience. There simply has been no experience whatsoever with cases of this kind in the Blair County Prison, nor in any other penal institution known to any witness. The Blair County policy seems to us to have been based simply on a reasonable but erroneous view of the state of Pennsylvania law.

**6.** Given the definition of "boy/girlfriend" currently used by the Prison Board, it is conceiva-

ble that an inmate could argue that he had several romantic relationships ongoing with noninmate visitors, each of whom would be entitled to visit him. The Solomonic choice this would present to the Warden should be ample evidence that there are less administratively burdensome ways to arrange visitation than to examine the extent or depth of an inmate's friendship with a visitor. This does not require a complex administrative scheme, or even notice and hearing. See *Kentucky Department of Corrections v. Thompson*, —— U.S. ——, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

ORDERED that the Blair County Prison Board visitation policy is declared invalid insofar as it requires prohibition of visitation between homosexual inmates and their noninmate boy/girlfriends, and the Blair County Prison Board and the Warden are permanently enjoined from denying visitation to Jane Doe solely on the basis of homosexuality.

The Clerk shall mark this matter closed.